Connie Louise LASCANO *v.* STATE of Arkansas

CR 81-112                                    631 S.W. 2d 258

Supreme Court of Arkansas
Opinion delivered March 22, 1982
[Rehearing denied May 3, 1982.*]

*ADKISSON, C.J., and PURTLE, J., would grant rehearing.

*Jeff Duty,* for appellant.

*Steve Clark,* Atty. Gen., by: *Arnold M. Jochums,* Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. Appellant was convicted of first degree murder and sentenced to 35 years in the Department of Correction. For reversal, she argues that the trial court erred in denying a motion to suppress tangible evidence, in admitting a confession and in refusing to declare a mistrial. We find no error and affirm the judgment.

On October 25, 1980, a Saturday, the body of Mrs. Jeannie Hunt was found in the kitchen of her Fayetteville home. She had been shot four times and death was thought to have occurred at about 8:30 or 9 the previous evening. Appellant, an acquaintance of Ben and Jeannie Hunt, was contacted by two deputies on Sunday evening and asked to come to the sheriff's office for questioning. Sergeant Doug

Fogley of the State Police began the interview by asking her name, address, phone number and when she had last seen Jeannie Hunt. Appellant said, "About 8:30 p.m. on Friday." He immediately explained her rights to her and obtained her signature on a waiver form. During the questioning appellant gave a non-incriminating account of her movements on Friday. Appellant was asked if she owned a handgun and said she did, which she kept in the glove compartment of her car. She agreed to a search of the vehicle and, when the pistol was not found, to a search of her apartment, which produced a partial box of Remington .22 caliber long-rifle cartridges containing 44 bullets, six less than the normal 50. The Remington cartridges had a yellow jacket, matching one recovered at the scene.

Appellant was told of these findings and that there was probable cause to charge her with murder. She remained in custody and at about 5 p.m. on Sunday she dictated and signed a confession. She gave an account of a turbulent love affair with Ben Hunt, the victim's husband, characterized by hostility and threats between the two women. In early October appellant purchased a pistol for protection, having some reason to think that Mrs. Hunt had a weapon. She said on Friday she saw Jeannie Hunt at a shopping center and decided to visit her; she wanted to find out where she stood with Ben and whether Ben and Jeannie planned to stay together. She took the pistol with her and arrived at about 8:30. They talked in the kitchen until Mrs. Hunt became angry. Shouting accusations she told appellant to get out of her house and pulled her toward the door. Appellant drew the pistol and fired four times at point blank range. She wiped her fingerprints from a drinking glass, drove home and changed clothes for work. After throwing the pistol from a bridge, she picked up her daughter and friends from a skating party and went to work. The pistol was later recovered by the police.

Appellant argues her Fourth and Fifth Amendment rights were violated by the trial court in admitting her confession and in refusing to grant her motion to suppress the physical evidence. She claims no attempt was made by the deputies to comply with Rule 2.3, A. R. Crim. P., by

informing her she was under no legal duty to accompany them to the sheriff's office. Further, before she was given the required Miranda warning she said she had seen Jeannie Hunt about 8:30 on Friday night. Appellant insists this admission that she had seen the victim near the time of death was fatal — that it opened the door to the whole case and everything obtained from her thereafter was tainted.

But the argument is not persuasive. No evidence at the scene implicated the appellant and there is no indication Sergeant Fogley regarded her as a specific suspect. Appellant had not been singled out as a suspect; all individuals acquainted with the victim were being contacted and under such circumstances it is not impermissible to ask some preliminary information questions without overstepping constitutional protectons. Here the interview had hardly begun and the questions asked were general. It seems entirely routine to ask when someone last saw the victim. Significantly, Sergeant Fogley immediately interrupted the questioning to give the Miranda warnings and there is nothing to suggest appellant was caught unawares by that single question. Her earlier steps to conceal the weapon and to wipe her fingerprints from the glass in the Hunt kitchen indicate she took deliberate precautions. Evidently she supplied a satisfactory explanation of her whereabouts on Friday and gave non-incriminating answers during the remainder of the interview. She had, in fact, seen Jeannie Hunt at a shopping center on Friday, but whether she was referring to that encounter is not revealed to us. However that may be, no other incriminating information appears to have been obtained from her. In short, in the absence of some indication of bad faith tactics by the officer or some particular vulnerability of the individual, we are not willing to say on the basis of that marginal question that everything the appellant later disclosed must be excluded. The constitutional protections against self-incrimination do not extend that far.

Procedures for custodial interrogation are prescribed by two well known decisions: *Escobedo* v. *Illinois*, 378 U.S. 478, decided in 1964 and *Miranda* v. *Arizona*, 384 U.S. 436, coming two years later. Neither case purports to dictate the

suppression of every statement or utterance given in the absence of the requested warnings, but rather of statements of those arrested or on whom suspicion has focused. Appellant suggests *Miranda* abolishes the distinction between the investigatory and accusative phases of crime detection. We disagree. The circumstances of this case and those present in *Escobedo* and *Miranda* invite comparison. Escobedo, with no warnings whatever, was confronted in custody with an alleged accomplice who accused him of murder. Escobedo said, "I didn't shoot Manuel, you did it." Handcuffed, Escobedo was questioned while standing up for four hours. Additionally, he was refused access to his retained counsel, who spent several hours at the detective bureau trying to confer with him. Somewhat similarly, Miranda was taken to police headquarters and identified by a rape victim; he was then questioned by two detectives for two hours without being told he had a right to counsel, nor was his right not to be compelled to incriminate himself effectively preserved.

By contrast, the testimony of witnesses, including appellant, show she was treated with deference. Sergeant Fogley said he repeatedly urged her to obtain counsel to no avail. Appellant, 33 years of age, is described as an articulate university student with a degree in education and completing requirements for a degree in marketing; the Miranda warnings were given her in writing no less than three times prior to her confession.

Appellant urges the point that Sheriff Marshall regarded her as a suspect. But that need not tarnish these proceedings. In many homicides an aura of suspicion initially touches spouses, lovers, rivals, even acquaintances, until attention can focus more clearly on one or more individuals. There is no evidence that appellant was more suspect than others in the beginning, as the sheriff's testimony reveals:

A: I considered her as a suspect in a homicide case. We consider everyone a suspect until we sort them out.

Q: So she was invited down to the police station at your

request and you considered her a suspect at that time?

A: She was no different in the case than numerous other people we had asked to come to the station to talk to us.

Q: They were all considered to be suspects?

A: That's correct. (p. 165.)

We cannot say the trial court's rulings on appellant's motions were against the preponderance of the evidence.

Appellant submits that no effort was made to comply with Rule 2.3, A. R. Crim. P., which requires that if a law enforcement officer asks a person to come to the police station he shall make it clear there is no obligation to comply. Whether the deputies observed the rule is not clear, as the question was never asked. It is clear that no objection was made to the trial court and, hence, it is not available to appellant on appeal. *Meyers* v. *State,* 271 Ark. 886, 611 S.W. 2d 514 (1981).

Appellant also urges that a mistrial should have been declared because appellant's counsel moved to withdraw during the course of trial. In chambers, with appellant present, defense counsel informed the court he felt a fraud was being perpetrated in that appellant revealed to him the principal purpose of her defense was to protect Ben Hunt and prove him innocent. Counsel represented to the court that he could not ethically defend appellant in light of that disclosure. The trial judge asked appellant if she and counsel had discussed the issue at length and she assured him she was fully satisfied with the representation she was receiving. In the end, and after a conference between appellant and counsel, the motion for a mistrial seems to have been withdrawn with Mr. Werner's comment, "Your Honor, we have reconsidered. We are going to call Dr. Finch to testify and also the defendant, if she wants to testify," and with that the trial continued. (See p. 715.) Under the circumstances we could hardly say the trial court abused its discretion.

The judgment is affirmed.

ADKISSON, C.J., and PURTLE, J., dissent.

RICHARD B. ADKISSON, Chief Justice, dissenting. By direction of the Washington County Sheriff two deputies "picked up" the appellant at her home, took her to the sheriff's office, and questioned her about the murder. Appellant responded, incriminating herself; she was then advised of her right to remain silent as required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966); afterwards, she made other incriminating statements.

At the time she was "picked up" from her home, she was one of two prime suspects in the murder. Evidence that this "pick up" was, in effect, an arrest can be garnered from the failure of the deputies to advise her that she was not required to accompany them. Such a statement is required by Rule 2.3, Ark. Rules Crim. Proc., Ark. Stat. Ann., Vol. 4A (Repl. 1977).

It is clear from these facts that this was a custodial interrogation to which *Miranda* was intended to apply. *Miranda* warnings should have been given at the beginning of the interrogation rather than after an incriminating question had been asked and answered. The admission in evidence of this statement was prejudicial error. This case should be reversed and remanded.

JOHN I. PURTLE, Justice, dissenting. The majority correctly states the body of Mrs. Jeannie Hunt was found in the kitchen of her Fayetteville home on Saturday, October 25, 1980. It was determined that she died about 8:30 or 9:00 p.m. on the previous evening. Since appellant was not taken into custody until about 7:30 p.m. on October 26, it was already known by the officers that the death had occurred at the time stated above.

Sheriff Herb Marshall was in charge of the investigation, and he stated: "It had to be one of two people." The two people he referred to were the appellant and Ben Hunt, the husband of the deceased. The majority opinion at one point

states: "Appellant had not been singled out as a suspect." This is simply incorrect in light of Sheriff Marshall's testimony recalling a conversation with appellant in which he said, "It is either you or Ben Hunt."

With the background information the officers possessed there was no excuse for not giving the appellant her warnings prior to the commencement of interrogation. Instead, the officers very skillfully asked her a few perfunctory questions and then came down to the heart of the case. After they had determined that she had been at Jeannie Hunt's house about the time of the murder they then decided to give her her warnings. The only thing the officers needed to know to determine the identity of the murderer was who was present at the victim's home at about 8:30 p.m. on Friday night. Having found out the appellant was this person they then proceeded to warn her. This is shutting the barn door after the horse is out.

It is ironic that the majority cites but two sources of the law upon which to base its opinion in regard to the questions raised by the custodial interrogation; those being *Miranda* v. *Arizona,* 384 U.S. 436 (1966), *Escobedo* v. *Illinois,* 378 U.S. 478 (1964). Both *Miranda* and *Escobedo* have held that a person has certain rights originating in that source of highest authority, the United States Constitution and the Bill of Rights. There is no justifiable way that the appellant's rights under the Fourth and Fifth Amendments have been protected despite the majority's apologia to that effect.

The exclusionary rule was first articulated in the case of *Weeks* v. *United States,* 232 U.S. 383 (1914). The United States Supreme Court found that evidence was obtained through a warrantless search and thereby declared it illegal. The court stated that if the evidence were accepted it "would be to affirm by judicial decision a manifest neglect, if not an open defiance, of prohibitions of the Constitution." The court reasoned that judicial integrity demanded that the courts not act as accomplices to violators of the constitution. The court developed this rule further in the case of *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 (1920). In *Silverthorne* the government had used an illegal search to

gain information upon which to base an indictment and to subpoena incriminating documents. In following the reasoning in the *Weeks* case Justice Holmes, speaking for the court, stated:

> ... The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all.

The doctrine culminated in the case of *Nardone* v. *United States,* 308 U.S. 338 (1939), wherein it was held that information acquired by such unconstitutional means were "fruits of the poisonous tree" and could not be used as evidence in a criminal prosecution. Justice Holmes stated in *Silverthorne* that without the exclusionary rule the Fourth Amendment becomes a mere form of words. Justice Brandeis stated in his dissent in *Olmstead* v. *United States,* 277 U.S. 438 (1928): " . . . If the court allows mistaken ideas of the requirements of the Constitution to pass muster, it will teach ignorance of the Constitution . . . " Therefore, if we allow illegal procedures, through ignorance or by design, to erode our processes, judicial integrity itself will be sacrificed in order to meet the needs of expediency. Justice Brandeis' *Olmstead* dissent was later afforded due deference by the court's specific overruling of *Olmstead* in *Katz* v. *United States,* 389 U.S. 347 (1967). Although the exclusionary rule originally applied only to the United States government, it was extended to the states through the Fourteenth Amendment to the United States Constitution in the case of *Mapp* v. *Ohio,* 367 U.S. 643 (1961). In *Mapp* the court stated that experience had determined that the exclusionary rule was the only effective means of deterring police misconduct in their zeal to apprehend criminals. It is abundantly clear in this case that the exclusionary rule, as previously discussed, would apply to violations of both Fourth and Fifth Amendment rights.

Regardless of the manner in which the majority sets forth the facts and the law in the present case, it is obvious that the appellant was one of only two suspects in this murder case. This was fully known by the officers when they

first questioned her. The warnings should have been given prior to the questioning. *Miranda* v. *Arizona*, supra. Therefore, all the talk about insisting upon her calling an attorney and reading her rights three or four times to her is an after the fact attempt to cover up the fatal error in this case. Even a guilty person is entitled to a fair trial. This is all the state or the defendant is entitled to.

In the case of *Hayes* v. *State*, 269 Ark. 47, 598 S.W. 2d 91 (1980), the facts show that the police went to Hayes' house as a starting point in their investigation of a murder that had occurred a short time previously. They knew that the deceased had been living with Hayes. He voluntarily accompanied them to the police department, then gave conflicting stories about when and where he last saw the victim. At that point the police decided he was a possible suspect and he was given his Miranda warnings. In the present case, it is abundantly clear that Connie Lascano was considered to be a suspect even before the officers came to get her.

Rule 2.3, A. R. Crim. P., states:

> If a law enforcement officer . . . requests any person to come to or remain at a police station, . . . he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

In the present case, two police officers appeared at appellant's home, advised her that they were police officers and asked her to come down to the sheriff's office, after which she was placed in the back seat of the police vehicle and transported to the sheriff's office. One of the officers, Sergeant Charles Rexford, testified in response to the question, "Did you tell her she was a possible suspect in the case?"; "No, I did not." Furthermore, the uncontradicted evidence is that the police officers made no attempt to comply with Rule 2.3. It is my opinion that this violation combined with the other, serious errors brought before us in this appeal should be grounds for reversal. There is no doubt in my mind but that there was ample legal evidence with which to convict the appellant. However, I would not

whittle away one word or one letter of the constitution in order to make the present conviction stand up.

I dissent.