Thomas Winford SIMMONS *v.* STATE of Arkansas

CR 82-18                    645 S.W.2d 680

Supreme Court of Arkansas
Opinion delivered February 7, 1983
[Rehearing denied March 14, 1983.]

*John W. Settle* and *Garner Taylor, Jr.,* for appellant.

*Steve Clark,* Atty. Gen., by: *Leslie M. Powell,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Thomas Winford Simmons, age 37, was sentenced to death for capital murder, in that he shot four persons in the back of the head, one of them while handcuffed and helpless. Simmons, represented in the trial court and here by the public defender, argues 22 points for reversal. We find no prejudicial error of any kind. For convenience we discuss Point 16 first, the sufficiency of the evidence, requiring a narrative of the facts, then the three points on which counsel place particular emphasis, and finally the other 18 points, grouping them when appropriate.

First, a narrative of the evidence. Simmons was charged with having caused the deaths of (1) Larry Price in the course of kidnaping, (2) police officer Ray Tate acting in the line of duty, and (3 and 4) Jawana Price (Larry Price's wife) and Holly Gentry in the course of kidnaping, robbery, and rape. We detail the events as they occurred, beginning on Saturday, January 3, 1981, and continuing through the following Wednesday. We should note at the outset that Simmons has made no statement about the homicides either to the investigating officers or at the trial, resting throughout on the plea of not guilty and his right to remain silent.

Holly Gentry, who was Jawana Price's employer, asked her to sell his car for him, a maroon-silver LTD. The Prices advertised the car for sale. On Saturday afternoon a witness who lived next to the Prices' apartment in Fort Smith saw a man drive up in a small yellow car. (Simmons's car was a small yellow Toyota.) The witness, who noticed the stranger looking at the LTD, told him that the Prices were away for the weekend and suggested that he come back during the week.

Early Monday morning a man came by to look at the LTD, according to statements made by Jawana Price when she went to the police that afternoon to report that her husband was missing. A neighbor testified that he saw

Simmons, whom he identified at a lineup and in court, looking at the LTD with Larry Price. According to Jawana's report, her husband and the visitor took a test drive together and were drinking coffee in the apartment when Jawana left for work in her own car.

At some time during the morning Simmons took to his branch bank in Van Buren a $350 check drawn on a Clarksville account that had been closed by the Prices some months earlier. Simmons received $50 cash and deposited the rest. The Price signature on the check was a forgery. The jury could have concluded that Simmons kidnaped Larry Price, killed him by shooting him in the back of the head, and hid the body in a wooded area not far from Simmons's home at Kibler in nearby Crawford county. The fact that blood from Price's head wound dripped into water just below where his body was hidden indicated that the wound was still bleeding when the body was concealed. The medical examiner testified that Price's death could have occurred during the day at any time after 8:00 a.m.

That afternoon the witness Seaton, working at a parking lot used by Jawana, noticed a man in a yellow Toyota watching Jawana's car for more than an hour. Seaton wrote down the license number, which was shown to be Simmons's number, but Seaton did not report the incident to the police until the next day, Tuesday.

Larry Price failed to meet Jawana for lunch as they had planned. She also learned that he did not show up for work that day. When she and Gentry left work that afternoon they drove in Gentry's pickup truck to police headquarters, where they reported Larry to be missing. They talked to Officers Davis and Tate. At about 6:00 p.m. Gentry and Jawana left the police station to go to the Prices' apartment, and Officer Tate left in his unmarked blue police car to meet them there. Shortly before that a man not clearly identified had engaged a taxicab and had been dropped off at the Prices' apartment complex.

James Davis, a neighbor across the street, saw a man (apparently Officer Tate) arrive at the Prices' apartment

complex in a blue car. The man looked briefly at the truck and then went into an apartment. Shortly after that another man made three trips from an apartment to the blue car. The first time he brought out a man whose hands were tied behind his back and had him get in the blue car. Next, he brought out another man, also tied, who was put in the car. Third, he brought out a woman, who was crying, and drove off with all three. Officer Tate had reported in by radio when he arrived at the apartment complex; he was never heard from again. Late that night Tate's police car and Gentry's LTD were found parked in public areas in or near Fort Smith.

When the branch bank opened on Tuesday morning, Simmons was waiting to get in. He asked for the return of the check he had deposited the day before. The two bank employees connected the name on the check, Larry Price, with the missing-persons account that was already extensively in the news. They mentioned that fact to Simmons, but said they did not have the check at the branch. When Simmons drove away his license number was written down by one of the bank employees, whose husband was a police officer. She at once called her husband about the incident. A quick investigation traced the number to Simmons, who had given his name and address at the bank. It was also learned that Simmons was on parole from a federal prison (a fact not disclosed to the jury), that he worked at a sand and gravel company near Fort Smith, that he had not been at work on Monday, having called in to say that he had an accident in his car, and that he was at work on Tuesday.

Several officers went out to the sand and gravel company to interview Simmons. According to them, he was cooperative and readily agreed to accompany them to headquarters for questioning about the check. At a suppression hearing the officers testified that Simmons explained he had encountered Larry Price on Sunday night and had received the check as payment for a sale of marihuana. He encountered Price at a later meeting on Sunday night, and Price said the check was bad. When the officers mentioned that Price was missing, Simmons refused to make any further statement and asked for an attorney. The officers

then placed Simmons under arrest for violation of his parole, ceased their questioning, and called the public defender to represent him. None of the testimony about Simmons's explanation was heard by the jury.

At about three o'clock on Tuesday afternoon a farmer working near Kibler, where Simmons lived, happened to find the bodies of Tate, Gentry, and Jawana Price, piled together in à big tractor tire in a field and partially concealed. Tate's hands were fastened behind his back with his handcuffs. On the basis of their total information the police charged Simmons with the murders at about 5:40 p.m. Larry Price's body was found by a deputy sheriff in the woods near Kibler on Wednesday, as a result of a telephone call.

Scientific testimony and other evidence provided much additional proof of Simmons's guilt. As to robbery, missing from the three bodies were the three men's wallets and Jawana's purse. As to rape, Jawana's body had slight bruises in the genital area, her pantyhose were on wrong side out, a belt was not through all its loops, and semen in her vagina matched Simmons's blood type but not that of Larry Price. A pistol lying under the three bodies was positively identified as the murder weapon. Its serial number had been filed down, but the number could be determined. That pistol had been bought by a neighbor of Simmons's, who had lost it in the woods some two years earlier and had reported the loss to the police. From the proof the jury could have found beyond a reasonable doubt that a hair from Simmons's body was discovered in Officer Tate's shirt and another hair from Simmons's body was found in Larry Price's sock. We have no doubt about the sufficiency of the evidence, circumstantial though it was.

Point 1 assigns error in the trial judge's denial of a requested change of venue. There was, understandably, much media publicity during the first few days, when the four victims were missing and after their bodies were found. Later the news coverage was not especially extensive. The affidavits submitted with the motion were conflicting, with the State's outnumbering those of the movant's. Most

important, the twelve jurors and two alternates, without exception, were accepted as "good for the defense." More than seven months elapsed between the original publicity and the trial. Only six of about sixty prospective jurors were excused because of their beliefs about Simmons's guilt. We agree that Simmons would have been entitled to a change of venue beyond the two-county circuit had the proof required a change, but it did not. The court was right in denying the motion. *See Perry v. State,* 277 Ark. 357, 642 S.W.2d 865 (1982).

Point 2 questions the denial of motion *in limine* by which defense counsel sought a ruling that if Simmons chose to testify the State could not impeach him by evidence of previous felony convictions if counsel first offered to concede that Simmons had previously been convicted of one felony.

Neither branch of counsel's twofold argument can be sustained. Primarily, it is argued that when counsel admitted one felony conviction, Simmons would then be effectively discredited and could not be further impeached by proof of other convictions (of which he had several). Neither the common law nor Uniform Evidence Rule 609 supports the argument. The common law permitted impeachment by proof of any felony conviction; Rule 609 contains limitations as to the time and nature of the convictions and as to their comparative probative value, but none as to their number. If proof that a witness has been convicted of murder or theft or perjury is admissible to impeach his veracity, as it usually is, then proof that he has committed such offenses time and time again may fairly be considered by the jury as further impairing his credibility. Counsel misinterpret our holding in *Campbell* v. *State,* 264 Ark. 372, 571 S.W.2d 597 (1978). There a State's witness had been impeached by a felony conviction. Campbell, trying his own case, asked the witness "the actual date and time that you received, or were sent to the penitentiary?" The trial judge disallowed the question, as irrelevant. We affirmed, saying: "[I]t is the fact of conviction that impairs the witness's credibility, not the date of the sentence or its length." Our point was that the details inquired about were not relevant. We did not mean

that the bare fact of a conviction of a felony precludes the cross-examiner from identifying that felony and others underlying the previous convictions. To the contrary, Uniform Rule 609, by requiring that probative value be weighed against prejudice and by admitting all convictions involving dishonesty, undeniably contemplates that the jury will know just what crimes the witness has been convicted of.

Secondarily, counsel argue that proof of a prior conviction for kidnaping would have been inadmissible, because its prejudicial effect would have outweighed its probative value in this case, where kidnaping is also involved. Our holding in *Jones* v. *State*, 274 Ark. 379, 625 S.W.2d 471 (1981), is cited, but it is not controlling. There the defendant, a grown man, was charged with having sexually molested a nine-year-old boy. We held that an earlier similar conviction involving another little boy was not admissible, because its prejudicial effect would clearly outweigh its probative value as bearing on credibility. It is common knowledge, however, that mature men who derive pleasure from sexual contact with very young boys are apt to repeat such conduct; so the prejudicial effect of the prior offense does overshadow its potential worth on the narrow issue of credibility. In *Jones* we pointed out that there may be instances in which proof of an earlier conviction for the same crime as that on trial may be admissible. Kidnaping, unlike sexual abuse of minors, is not the sort of offense that perverted people are apt to commit again and again. We cannot say that the trial judge abused his discretion in concluding that a prior conviction for kidnaping would be admissible if Simmons elected to testify.

As to such an election, we make a point for the future. A motion in limine, asking for an advance ruling that the defendant not be exposed to cross examination about certain convictions, is subject to abuse, in that the accused may not intend to testify at all and yet seek a ruling in the hope of leading the trial judge into reversible error, with the possibility of a new trial and a second chance of acquittal. Some courts have met the problem by denying review unless the defendant actually testifies at the trial. That has not been

our position in the past, nor is it now. We do adopt, however, the rule approved by the majority in *United States v. Cook*, 608 F.2d 1175 (9th Cir. 1979), where the opinions on both sides discussed all aspects of the problem. The majority summed up its ruling as follows:

> In future cases, to preserve the issue for review, a defendant must at least, by a statement of his attorney: (1) establish on the record that he will in fact take the stand and testify if his challenged prior convictions are excluded; and (2) sufficiently outline the nature of his testimony so that the trial court, and the reviewing court, can do the necessary balancing contemplated in Rule 609.

In adopting what we regard as the better rule we realize that in some instances a defendant may prefer not to outline his expected testimony at a pretrial hearing held before the prosecution's witnesses have testified. In that situation the trial judge may postpone a ruling upon the motion *in limine* until the State has rested and the time has come for the defendant to reach his final decision about testifying. At that stage of the trial there would be scant basis for his refusal to outline the testimony he expects to give almost immediately.

In Point 12 counsel attack the admissibility of various physical exhibits introduced in evidence by the State, as being fruits of the poisonous tree, because (a) Simmons was illegally arrested at his place of work, (b) his consent to search his car was invalid, and (c) search warrants under which his house was searched and under which samples of his blood and hair were taken were not supported by sufficient affidavits.

Subpoints (a) and (b) may be discussed together, both turning on issues of fact. The undisputed testimony is that Simmons willingly accompanied the officers to the police station and that he willingly consented to the search of his car. As in *Lascano v. State*, 275 Ark. 346, 631 S.W.2d 258 (1982), the officers were not asked whether they told Simmons that he did not have to accompany them. It is argued that the officers should have told Simmons that he was a

suspect in the disappearance of four persons, but that assertion is too sweeping. The officers knew that Simmons was on parole, that he had sought the return of a Price check he thought to be bad, and that he had not been at work on Monday. Innocent explanations were obviously possible. Simmons's statements to the officers were not put before the jury. The only exhibits taken in the search of his car were the license plate, which was otherwise provable in countless ways, and a matchbook, the relevance of which is not clear. Thus on subpoints (a) and (b) the trial judge's decision on issues of fact is not clearly erroneous, and even if it were no prejudice has been shown.

As to (c), we need not quote the detailed affidavits for the search warrants. The only really serious argument here is that the affidavits did not show the reliability of two informants: James Davis, who saw the three victims being taken from the apartment to Tate's car, and Donald Seaton, who saw Simmons watching Jawana's car at the parking lot. Davis and Seaton, however, were not confidential informants whose identity was being protected. They volunteererd information simply as good citizens. The police necessarily rely upon such information every day in the course of their work, without first exploring abstract issues of credibility. Hence no additional support for the reliability of Davis and Seaton was required. *Hadley* v. *State*, 391 So.2d 158 (Ala. Cr. App., 1980); *People* v. *Bell*, 96 Ill. App. 3d 857, 421 N.E.2d 1351 (1981); *State* v. *Watson*, 588 S.W.2d 178 (Mo. App., 1979).

Points 3, 4 and 13 have to do with pretrial decisions. In Point 3 it is argued that the defense should have been allowed more than $200 to conduct its investigation into possible defenses. Counsel, however, do not show that the amount was inadequate or even suggest any defense that might have been discovered. Their client, whether innocent or guilty, surely was aware of any fact that might establish his innocence. As to Point 4, the validity of our death penalty statute has been settled by many cases, beginning with *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106, cert. denied, 434 U.S. 878 (1977). Point 13, questioning the lineup procedure, is also without merit. From a lineup of men not

greatly dissimilar to Simmons in general appearance, he was picked out by the witness Gilbert, who had talked to Simmons for about five minutes on Saturday, only four days before the lineup, and by the witness Kremen, the neighbor who had seen Simmons and Larry Price looking at the for-sale LTD only two days earlier. Under the various tests of reliability enumerated in *Mayes* v. *State,* 264 Ark. 283, 288, 571 S.W.2d 420 (1978), and other cases, the trial judge's decision was not wrong.

Points 5, 6, 7, and 8 concern the selection of the jury. Point 5 must be rejected, for we have often held that a death-qualified jury is constitutional. Points 6 and 7 complain of counsel's having had to use peremptory challenges for prospective jurors after challenges for cause had been denied. The challenges for cause were properly denied, and in any event the defense was not compelled to accept any juror who was not pronounced good by counsel. Under Point 8 it is argued that the State should not have been allowed to peremptorily challenge two jurors who had already been accepted by both sides. That procedure was approved in *Conley* v. *State,* 272 Ark. 33, 612 S.W.2d 722 (1981), where the defense had no peremptory challenges left when the State was allowed to excuse a juror already seated. By contrast, here the defense still had three challenges left when the two jurors were excused. In fact, the defense apparently did not suffer from a shortage of peremptory challenges, because (a) the prosecutor cooperated by making no objection to defense challenges for cause, (b) defense counsel mentioned more than once that they *had* to exhaust their peremptory challenges to preserve their objection to venue, and (c) no juror was forced upon the defense. No possible prejudice from the court's procedure appears.

Five points relate to the admissibility of evidence. Point 9: The prosecution did not unfairly withhold evidence merely because the deputy sheriff who received a telephone call about the discovery of Larry Price's body at first protected the caller's request for anonymity, but disclosed the caller's identity at the trial after the caller had given permission. There is no indication that the officer acted in bad faith, that he had disclosed the name to the prosecutor,

or that the defense was handicapped by not knowing earlier the identity of the caller. There was no request for a continuance. Point 10: The court correctly refused to admit proof that some of Simmons's relatives had blood type A, which was the Prices' type and the type found on Simmons's trousers. There was no proffer of proof that the relatives' blood could in any way have gotten upon the trousers. Point 14: The four photographs complained of were relevant and in no manner whatever apt to inflame the jury. Point 15: Any possible gaps in the chain of custody of blood samples were inconsequential, and there was no substantial indication of possible tampering. *Davis* v. *State,* 275 Ark. 264, 630 S.W.2d 1 (1982). Point 18: During the penalty stage of the two-step trial the court correctly refused to allow the defense to introduce pictures of a gas chamber, a gallows, and an electric chair, none of which can be regarded as a mitigating circumstance. Such circumstances, as typified by the six listed in Ark. Stat. Ann. § 41-1304 (Repl. 1977), are applicable only to the particular defendant, not to capital punishment in general.

Five points relate to matters occurring after the parties had rested their case. Point 11: Whether to send the jury to the scene of the Prices' apartment, to determine how well the witness Davis could have seen the three victims being taken to the car at some imprecise time after sunset, was a matter addressed to the trial judge's discretion. *Hogan* v. *State,* 224 Ark. 191, 272 S.W.2d 312 (1954). No abuse of discretion is shown. Point 17: The court was right in submitting to the jury the various charges of capital murder, for we have already seen that there was substantial evidence to support each verdict. Points 21 and 22: The court refused to instruct the jury that it had to presume that if Simmons were sentenced to life imprisonment without parole he would spend the rest of his life in prison and refused to rule that if defense counsel made such an argument to the jury the prosecutor should be prohibited from mentioning in reply the possibility of executive clemency. Both rulings were right. For the reasons fully explained in *Andrews* v. *State,* 251 Ark. 279, 472 S.W.2d 86 (1971), the judge should not, and therefore counsel should not, attempt to explain matters of parole or other executive clemency to the jury.

Point 19 is novel. The verdict forms submitted to the jury in a capital case restrict the jury to certain aggravating circumstances, but the jury is not restricted in finding mitigating circumstances. Here the forms pertinent to the murder of Jawana Price, Tate, and Gentry, were returned with a notation that some of the jurors felt that "fear of detection" was a mitigating circumstance. Counsel asked for a mistrial, arguing that the jury must have misunderstood the court's instructions, because fear of detection would be an aggravating circumstance, not a mitigating one. The court refused to declare a mistrial; an offer to poll the jury was declined by the defense.

The court was right, for either of two reasons. The jury's answers to the questionnaire must be interpreted by considering how *they* could have understood the question. *Miller* v. *State,* 269 Ark. 341, 355, 605 S.W.2d 430 (1980). Since the jury did not insert "fear of detection" as a mitigating circumstance in the death of Larry Price, which apparently occurred before the three other deaths, some jurors might have felt that fear of detection for the first murder mitigated the coldbloodedness of the other three. That view would have made their response a proper one. Second, if the verdict was ambiguous the judge could have sent the jury back for a further explanation of its intent. *Clift* v. *Jordan,* 207 Ark. 66, 178 S.W.2d 1009 (1944). Since counsel stood upon the motion for a mistrial and permitted the jury to be discharged without a clarification of the verdict, we cannot now resolve a highly doubtful speculation in the appellant's favor. *Reynolds* v. *Nutt,* 217 Ark. 543, 230 S.W.2d 949 (1950).

Finally, the argument under Point 20 that the penalty was so severe as to indicate passion and prejudice cannot be sustained. In comparing this death sentence with similar cases, as is our practice, we know of no other case involving multiple murders so coldblooded, so brutal, so lacking in any trace of humanity, as those committed by Simmons. We cannot attribute the verdict to passion or prejudice or say that it is arbitrary in comparison with other cases. Nor do we find any prejudicial error in any other ruling adverse to the defendant.

Affirmed.