SLIP OPINION

Cite as 2015 Ark. App. 211

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR–14–519

| | |
|---|---|
| DONNIE FRONTERHOUSE<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered** APRIL 1, 2015<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. CR-12-1590]<br><br>HONORABLE WILLIAM A. STOREY, JUDGE<br><br>REVERSED AND REMANDED |

**DAVID M. GLOVER, Judge**

Donnie Fronterhouse was tried by a jury and found guilty of the offenses of arson and residential burglary. The trial court denied his motion for a new trial, and this appeal followed. He raises four points of appeal: 1) in light of the common-law presumption against arson, did the evidence sufficiently establish that Fronterhouse committed arson and residential burglary; 2) did the circuit court err by not allowing Fronterhouse to impeach a witness with her prior convictions involving dishonesty and false statements; 3) should the circuit court have instructed the jury on the common-law presumption against arson; and 4) did a juror's failure to correctly answer questions on a jury questionnaire and during voir dire violate Fronterhouse's rights to an impartial jury and due process under the United States and Arkansas constitutions. We reverse and remand for a new trial, finding error in the trial court's refusal to allow the impeachment evidence. Even though we are reversing and

SLIP OPINION

remanding on that basis, because of double-jeopardy considerations, we will also address Fronterhouse's challenge to the sufficiency of the evidence supporting the verdicts. Additionally, because the issue is likely to arise again upon retrial and because Fronterhouse incorporates the presumption into his sufficiency challenge, we will also address his argument that the trial court erred in refusing his proffered instruction on the common-law presumption against arson. We will not, however, address his argument regarding juror misconduct because it is now moot, and it will not arise again upon retrial.

*Sufficiency of the evidence*

Fronterhouse challenges the sufficiency of the evidence supporting his convictions for arson and residential burglary. Again, because of double-jeopardy concerns, we address his challenge to the sufficiency of the evidence first, before our review of any asserted trial errors. *Foshee v. State*, 2014 Ark. App. 315. The test we employ to determine the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is that which is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Sullivan v. State*, 2012 Ark. 74, 386 S.W.3d 507. We view the evidence in the light most favorable to the appellee, which in this case is the State, and only evidence supporting the verdict is considered. *Id.*; *Foshee, supra*. We do not weigh the evidence presented at trial because that is a matter for the fact-finder, and neither do we assess the credibility of the witnesses. *Sullivan, supra*. Although it is true that circumstantial evidence is insufficient as a matter of law if it leaves the jury solely to speculation and conjecture, the fact that evidence is circumstantial does not necessarily

render it insubstantial. *Satterfield v. State*, 2014 Ark. App. 633, 448 S.W.3d 211. The law makes no distinction between circumstantial and direct evidence when reviewing for sufficiency of the evidence, and circumstantial evidence is sufficient if it excludes every other reasonable hypothesis consistent with innocence; whether the evidence excludes every other reasonable hypothesis is left to the jury to determine. *Id.* The jury, as fact-finder, is free to believe all or part of a witness's testimony and may resolve all questions of conflicting testimony and inconsistent evidence. *Id.*

Arkansas Code Annotated section 5–38–301 (Repl. 2013) provides in pertinent part that a person "commits arson if he or she [s]tarts a fire or causes an explosion with the purpose of destroying or otherwise damaging . . . an occupiable structure . . . that is the property of another person[.]" In making his argument that his arson conviction under this statute is not supported by substantial evidence, Fronterhouse also relies upon a common-law presumption concerning arson that has been articulated in several Arkansas cases. The State acknowledges that the presumption existed in Arkansas at the time of the July 2012 fire, even though it has since been eliminated by statute.[1] At least as early as 1939, the presumption was explained in the following manner by our supreme court:

> There is no presumption that an unexplained fire is of incendiary origin. On the contrary, the presumption is that such fire was caused by an accident, or, at least, that it was not of criminal design. In a prosecution for arson, as in other criminal cases, it is incumbent on the State to prove the corpus delicti, and it is now recognized as the universal rule in the law of arson that in order to establish the corpus delicti it is not

---

[1]Ark. Code Ann. § 5–38–312 (Repl. 2013) (specifically abolishing "any common law contrary to this section, including without limitation *Johnson v. State*, 198 Ark. 871, 131 S.W.2d 934 (1939), and *Thomas v. State*, 295 Ark. 29, 746 S.W.2d 49 (1988)[.]")

SLIP OPINION

only necessary that the State prove the burning of the building [or property] in question, but the evidence must also disclose that it was burned by the wilful act of some person criminally responsible for his acts, and not by natural or accidental causes.

*Johnson v. State*, 198 Ark. 871, 873, 131 S.W.2d 934, 935.  (Overturned by legislative action. *See* n. 1, this opinion.)  This presumption will also be discussed subsequently as it pertains to Fronterhouse's argument that the jury should have been instructed on it.

Fronterhouse also challenges the sufficiency of the evidence supporting his conviction for residential burglary under Arkansas Code Annotated section 5-39-201 (Repl. 2013), which provides in pertinent part that a person "commits residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment."

Here, viewing the evidence in the light most favorable to the State and considering only the evidence that supports these verdicts, that evidence shows that Tara Sue Diaz-Ramirez lived in Apartment No. 202 on the second floor of a two-story complex that had eight apartment units on each of the two floors.  Tara's friend and neighbor, Tiffany Byers, lived across the hall in the apartment complex.  Tara and Fronterhouse had a tumultuous relationship, with him sometimes staying in her apartment at night, although he never had a key or paid rent, and sometimes staying in the open field behind her apartment as well as other places.

On the night of July 6--7, 2012, Tara's apartment burned.  Springdale Police Detective

Matt Ray testified that he was the lead detective in the case. He received a call at 2:03 a.m. and arrived at the scene at 2:22 a.m. He said that fire personnel were already on the scene, including at least one fire investigator; and that the fire had been extinguished. Fronterhouse was staying in the field behind Tara's apartment on the night of the fire. Detective Ray said that he encountered Fronterhouse at 4:22 a.m. when Fronterhouse was coming through a fence on the north side of the field opposite the apartments; that Fronterhouse was coming from the direction of the apartments; and that Fronterhouse had a pack of cigarettes and a red lighter.

Two experts testified about their independent investigations concerning the origin of the fire—Edward Stith, a retired Springdale fire marshal, and John Jenkins, a senior fire investigator with Unified Investigation and Sciences. Both agreed that the fire started in a closet of Tara's apartment, that the building did not have gas lines, that there was no evidence of an electrical cause for the fire, that there were no storms or lightning in the area at that time, that there was no evidence of candles in the closet area or cigarettes or ignitable liquids, and that the closet contained clothing and cardboard boxes with various household items. In short, both experts testified and agreed about the things that did not cause the fire. In addition, both further agreed that in investigating fires, they also base their opinions on external information such as witness statements and physical evidence. They both expressed their opinions that the front door of Tara's apartment had been forced open prior to the fire. The evidence showed that the door's deadbolt was extended, the door jamb was split, there

5

was extensive fire damage to the exterior of the door indicating it was open during the fire, and witness information stated that the door was open prior to the fire department's arrival. Jenkins testified further that he also found nothing in the apartment that could have been associated with spontaneous combustion. He stated that in his opinion the fire started between 11:40 p.m. and 1:00 a.m., and that he believed it was a slow-smoldering fire. Also, in responding to cross-examination about the investigation and whether it comported with National Fire Protection Association's guidelines (specifically, those guidelines' rejection of the negative-corpus method as being inappropriate because it could lead to the possibility of incorrect determinations regarding the ignition source), Jenkins defended his position that the fire was deliberately started and noted a different provision of the guidelines that stated, "[T]here are occasions when there is no physical evidence of the ignition source but an ignition source can be hypothesized based on other data." Both experts concluded and agreed that the fire was deliberately started by human intervention, i.e., that it was not a natural or accidental fire. They classified the cause of the fire as incendiary, rather than as unknown.

Tara testified that Fronterhouse frequently drank alcohol; that he badgered, bullied, and threatened her; that he would bite her, slap her, and punch her; that he wanted her to be submissive; that the more she tried to ignore him, the more his anger would escalate; that he would bang on her door late at night, drunk, wanting in the apartment; that she called the police on him several times, but he would leave before they arrived; that he called her at work; that she agreed to go camping with him, but on July 6, the night of the fire, she told

Fronterhouse that she did not love him and that "he made her skin crawl"; that she took him to her apartment and he left with his beer; that he was living in the field behind the apartment at that time; that she left the apartment because she did not want to be around him and "the look on his face scared her"; that she stayed away fifteen to thirty minutes; that when she drove back by, Fronterhouse was on the balcony; that she waited, came back, and he was gone; that she swept up a broken beer bottle on the steps and was sitting on the patio with her friend, Tiffany, when he came back; that he demanded she give him a chair, but she declined; that he took his clothes and bicycle and left; that he was drinking when she saw him; that she thought Fronterhouse left, but when she was talking to her son on the phone she "found" him; that he screamed and cussed at her; that her son heard it and told her to leave; that she couldn't leave because Fronterhouse was by the car; that he eventually left and she drove to the park "to gather her thoughts"; that she went back to the apartment to get a change of clothes but noticed Fronterhouse's phone and one of his shirts, so she put those items in a bag and put the bag outside her door, locked the door, and left; that she was on her way to her friend Nico's house in Green Forest; that Fronterhouse called her around 11:00 p.m. and told her he had his phone; and that Tiffany called her later and told her the apartment was on fire.

Tara also testified that she received text messages from Fronterhouse after the fire referencing the "weenie roast" and "Jesse Martinez," which had special meaning to her because when she was five years old, her father, Jesse Martinez, found out her mother was

SLIP OPINION

cheating on him, and he had the children put clothes he had bought the mother in a basket and he set fire to them, calling it a weenie roast. She stated that she did not gain anything financially from the apartment-complex fire and that she did not know of anyone (besides Fronterhouse) who had a grudge against her.

Voice-mail recordings and text messages from Fronterhouse were also introduced. Each side characterized them as either harassing (Tara) or nonharassing (Fronterhouse).

Fronterhouse contends in part that the circumstantial evidence is not sufficient to support the verdicts against him because another reasonable conclusion that can be drawn from the circumstantial evidence is that Tara's friend, Tiffany, started the fire in order to frame him for it because he had threatened actions that would put Tiffany's felony-drug probation[2] in jeopardy. In addition, Fronterhouse argues that the two fire-investigation experts merely proved that these experts had no proof of how the fire started, and that, according to the National Fire Protection Association's guidelines for fire investigations, a "negative corpus" process should not be used to determine the cause of a fire.

We conclude that the jury did not have to resort to speculation or conjecture in reaching its verdicts and hold that there is substantial evidence supporting Fronterhouse's

---

[2]In addition to Tiffany's two misdemeanor convictions that will be discussed subsequently and form the basis for Fronterhouse's argument that he should have been allowed to use them to impeach Tiffany, she also had two felony convictions—one of which she had served time on and the other she was on probation for at the time of the July 2012 fire.

convictions for both arson and residential burglary. Credibility determinations, including those with respect to expert testimony, are for the trier of fact, which in this case was the jury. *Satterfield*, *supra*. In addition, fire-expert Jenkins specifically testified that he used all of the physical data available, including witness statements, to reach his conclusion that the fire was started because of human intervention, which he explained was in accordance with the National Fire Protection Association's guidelines. And the jury clearly did not accept Fronterhouse's theory of the case either was that it was a random fire or that Tiffany started the fire and framed him. In short, there was sufficient evidence to establish that Tara's apartment was forcibly entered without her permission when she was not present, that a fire was purposely set in her apartment to cause damage, and that Fronterhouse was the person who set it.

*Witness impeachment*

As discussed previously, Tiffany Byers is Tara's friend and neighbor who Fronterhouse contended was probably responsible for starting the fire in order to frame him for it. Tiffany had two misdemeanor convictions in 2006 (i.e., within 10 years of the trial), one for improper use of evidence of registration, or "fictitious tags" as denominated by Fronterhouse, and one for criminal impersonation. At trial, Fronterhouse attempted to impeach her by introducing evidence of the two convictions, but the trial court would not allow it. With respect to the conviction for improper use of evidence of registration, the trial court based its decision on the following rationale: "Fictitious tags [doesn't] go to anything. It doesn't have anything to

SLIP OPINION

do with dishonesty. I'm gonna sustain the objection. That's my ruling." In not allowing the criminal-impersonation conviction, the trial court reasoned, "Unless you can tell me what the facts of the criminal impersonation conviction are, then I'm not gonna permit it. If you can tell me and explain to me that goes somehow to what you're trying to do then I'll permit it, but if you don't know the facts, I'm not gonna permit it. So that's my ruling."

When Fronterhouse proffered the certified convictions, the trial court additionally explained that "unless I know what the facts of those cases were that gave rise to the convictions, I don't know if they involved dishonesty, false dealing, or anything else so I'm gonna again sustain the objection, just for the record, to the inquiry of this [witness] relating to those convictions."

Rule 609(a) of the Arkansas Rules of Evidence provides in pertinent part: "For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime . . . (2) involved dishonesty or false statement, regardless of the punishment." Crimes involving dishonesty and false statements are regarded as probative of credibility and can be used to impeach a witness's credibility. In *Wal-Mart Stores, Inc. v. Regions Bank Trust Dep't*, 347 Ark. 826, 839, 69 S.W.3d 20, 28--29 (2002), our supreme court quoted with approval the congressional commentary to Federal Rule of Evidence 609(a), which is identical to our Rule 609(a):

> The admission of prior convictions involving dishonesty and false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted. Thus, judicial discretion granted with respect to the admissibility of other prior convictions is not applicable to

those involving dishonesty or false statement.

Our supreme court further quoted with approval the Senate Conference Committee Report on Rule 609(a):

> A leading commentator notes that such "second-prong crimes"—i.e., those involving dishonesty or false statements—clearly include crimes such as perjury, criminal fraud "in many different forms," embezzlement, and false pretense, but points out that "this list is not exhaustive, and certainly forgery and counterfeiting should be included, along with other crimes involving deceit, untruthfulness, or falsehood."

*Id*.

Fronterhouse contends that the trial court erred in refusing to allow him to introduce evidence of Tiffany's two 2006 misdemeanor convictions because they satisfied the requirements of Rule 609. The State acknowledges that evidence satisfying Rule 609 is always admissible for impeachment purposes and that a trial court's refusal to admit it constitutes an abuse of discretion. The State further argues, however, and as asserted by the trial court, that "where there is no offer of proof as to the factual circumstances involved in the conviction, the court may be unable to determine whether the convictions should be admissible as one involving dishonesty or false statements," citing *West v. State*, 27 Ark. App. 49, 766 S.W.2d 22 (1989). *West v. State* involved a conviction for hindering apprehension. The *West* opinion explained that there were six different ways to hinder apprehension, with only one involving dishonesty or false statement, and that it was therefore necessary for the proponent of the evidence to demonstrate that the conviction was based on a dishonest act or false statement.

As mentioned previously, Tiffany's two prior misdemeanor convictions that

Fronterhouse sought to introduce pursuant to Rule 609(a) were improper use of evidence of registration and criminal impersonation. Arkansas Code Annotated section 27-14-306(a) (Repl. 2014) (improper use of evidence of registration, or "fictitious tags," as denominated by Fronterhouse) provides in pertinent part:

> No person shall lend to another any certificate of title, registration certificate, registration plate, special plate, or permit issued to him or her if the person desiring to borrow it would not be entitled to the use thereof, nor shall any person knowingly permit their use by one not entitled thereto, nor shall any person display upon a vehicle any registration certificate, registration plate, or permit not issued for the vehicle or not otherwise lawfully thereon under this chapter.

Arkansas Code Annotated section 5-37-208 (Repl. 2013) (criminal impersonation) provides in pertinent part:

> (b)(1) A person commits criminal impersonation in the second degree if the person does an act in his or her pretended or assumed capacity or character with the purpose to injure, defraud, harass, or intimidate another person and the actor:
>
> (A) Assumes a false identity;
>
> (B) Pretends to be a representative of a person or organization;
>
> (C) Pretends to be an officer or employee of the government other than a law enforcement officer described in subsection (a) of this section;
>
> (D) Pretends that he or she is a law enforcement officer when the person is not a law enforcement officer; or
>
> (E) Pretends to have a handicap or disability.

Fronterhouse argues that *West*, *supra*, can be distinguished if the statute defining the offense underlying the conviction sought to be introduced does not involve other ways, in addition to dishonesty or false statement, that the offense is accomplished. The State acknowledges

that, at least with respect to criminal impersonation, "[w]hile most of the possible violations of this statute would involve 'dishonesty or false statement,' the trial court did not abuse its discretion by requiring the appellant to prove the exact circumstances of the crime to show that they did include such an act." We draw from that statement that the State agrees with the trial court's basic position that the proponent of the conviction must always demonstrate the underlying facts giving rise to the conviction in order to establish that it involves dishonesty or false statement. We disagree.

As explained in the *West* case, five of the six ways a person could be convicted under the statute at issue there did not involve dishonesty or false statements. Accordingly, it makes sense that the trial court in *West* would need more facts to satisfy the requirements of Rule 609. We do not extrapolate from *West*, however, that it is always necessary for the proponent of such evidence to demonstrate the underlying facts giving rise to the conviction—especially when the definition of the offense itself clearly demonstrates that dishonesty or false statement is necessary to be convicted of the offense. Here, we conclude that both of the convictions at issue involve dishonesty or false statements by the very definitions of the offenses. Consequently, requiring the underlying facts in those situations would be redundant and a distraction from the facts of the offenses charged and being tried.

Possibly anticipating that we would take that view of the situation, the State makes two alternative arguments for affirming: 1) if it was error to exclude the convictions, it was not prejudicial error because the evidence was merely cumulative; and 2) even if not cumulative,

the error was harmless because the evidence of guilt was overwhelming and the error was slight. We disagree with both alternative arguments.

Rule 609 contains limitations regarding the time and nature of the convictions, but no limitations concerning the number of convictions. *Simmons v. State*, 278 Ark. 305, 645 S.W.2d 680 (1983). In making its "cumulative" argument, the State contends that the two proffered convictions would be merely cumulative to Tiffany's two drug convictions that were brought out during the trial. We are not convinced. The two convictions that the trial court would not allow Fronterhouse to use in impeaching Tiffany involved dishonesty or false statements, which, as previously explained, are peculiarly probative of credibility and are always to be admitted. *Wal-Mart*, *supra*. Neither are we able to conclude that the error was harmless, i.e., that the error was slight and the evidence of guilt was overwhelming. While the evidence presented at trial was sufficient to support Fronterhouse's convictions for both residential burglary and arson, we cannot say that the evidence of his guilt was so overwhelming as to render harmless the trial court's refusal to allow the proffered impeachment evidence pursuant to Rule 609. In addition, Fronterhouse was attempting to develop a reasonable alternative theory of the case under which he wanted to convince the jury that it was Tiffany, not he, who was responsible for setting the fire and framing him, making impeachment of her credibility important. Whether the jury would have concluded that the evidence successfully impeached her credibility or that his alternative theory was a reasonable one is another matter, but the evidence he sought to introduce to impeach

Tiffany's credibility satisfied the requirements of Rule 609, and he should have been allowed to do so. We simply cannot say that the trial court's refusal of the evidence was harmless.

For his two remaining points of appeal, Fronterhouse challenges the trial court's denial of his request to have the jury instructed on the common-law presumption against arson that was in effect at the time of the offense and the trial court's denial of his motion for a new trial based on allegations of juror misconduct. Because we are reversing and remanding this case based on the trial court's refusal to allow Fronterhouse to present impeachment evidence pursuant to Rule 609 of the Arkansas Rules of Evidence, it is not necessary to address the juror-misconduct issue. We do, however, address Fronterhouse's argument concerning the request for an instruction on the common-law presumption against arson because it could arise again upon retrial.

*Instruction regarding common-law presumption against arson*

Fronterhouse proffered three instructions concerning the common-law presumption against arson discussed earlier in this opinion, seeking to have one of them given to the jury:

1)      There is a presumption under the law that an unexplained fire was caused by accident, or that it was not of criminal design. In order to overcome this presumption, the State must prove, beyond a reasonable doubt and by evidence of substantial character, that a fire was burned by the willful act of some person criminally responsible for his or her acts.

2)      There is a presumption under the law that an unexplained fire was caused by accident, or that it was not of criminal design. In order to overcome this presumption, the State must prove, by evidence of substantial character, that a fire was burned by the willful act of some person criminally responsible for his

or her acts.

3)      There is a presumption under the law that an unexplained fire was caused by accident, or that it was not of criminal design.

The arson instruction that was actually given by the trial court provided in pertinent part:

Arson.  Donnie Fronterhouse is charged with the offense of Arson.  To sustain this charge the State must prove the following things beyond a reasonable doubt.  First, that Donnie Fronterhouse started a fire or caused an explosion, and second, that he did so with the purpose of destroying or otherwise damaging an occupiable structure that was the property of another person.

Purpose.  A person acts with purpose with respect to his conduct or a result thereof when it is his conscious object to engage in the conduct of that nature or to cause such a result.

Fronterhouse contends that the trial court abused its discretion by not employing one of his proffered instructions to instruct the jury, and that, despite the fact the instruction  given required the jury  to find beyond a reasonable doubt that Fronterhouse started the fire, the trial court's refusal to instruct on the common-law presumption relieved the State from its *additional* burden of proving beyond a reasonable doubt that the fire did not occur from natural or accidental causes, thereby "remov[ing] the presumption's  entire bite."  We are simply not convinced by Fronterhouse's argument.

The State counters that even if the proffered instructions correctly describe the common-law presumption, it is not error for the trial court to refuse them if the model instructions cover the issue, and that the instruction given by the trial court was adequate. We agree with the State's position.

Instructions that do not conform to the model instructions should be given only when

the trial judge finds the model instructions do not accurately state the law or do not contain a necessary instruction on the subject. *Ross v. State*, 300 Ark. 369, 779 S.W.2d 161 (1989). Under the instruction given, the jury was required to find beyond a reasonable doubt that Fronterhouse started a fire with the purpose of destroying or damaging the structure. Under this instruction, the jury necessarily had to exclude natural or accidental causes for the fire, which was consistent with the proffered instructions. Consequently, we find no error in the trial court's refusal to employ any of the proffered instructions.

Reversed and remanded.

VIRDEN and GRUBER, JJ., agree.

*The Mullenix Firm, PLLC*, by: *D. Ryan Mullenix*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.