Thomas SIMMONS, Petitioner,

v.

A.L. LOCKHART, Director of the
Arkansas Department of
Correction, Respondent.

No. PB-C-83-411.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

March 21, 1989.

**1458**

Jack Gillean, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for petitioner.

Jim Hunter Birch, Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### PRELIMINARY STATEMENT

Thomas Winford Simmons was tried in the Circuit Court of Crawford County, Arkansas for the murder of a married couple, their landlord and a Fort Smith, Arkansas police officer. In unanimously affirming his conviction, the Supreme Court of Arkansas stated, "We know of no other case involving multiple murders so cold blooded, so brutal, so lacking in any trace of humanity, as those committed by Simmons." *Simmons v. State,* 278 Ark. 305, 645 S.W.2d 680, 688 (1983).

This limited remand by the Court of Appeals for the Eighth Circuit, 856 F.2d 1144, focuses principally on the defense afforded Simmons by trial counsel John W. Settle, the public defender, along with the role of a prosecution witness, James Davis. Although the testimony of Davis was significant, there was other testimony, very substantial in nature, which connected Simmons with the crime. The testimony is recited in detail in the decision of the Supreme Court of Arkansas, *supra,* and in the opinion of the Court of Appeals affirming denial of the original *habeas* petition. *Simmons v. Lockhart,* 814 F.2d 504 (8th Cir.1987).

Davis' testimony at the Simmons trial was summarized as follows by the Supreme Court of Arkansas:

James Davis, a neighbor across the street, saw a man (evidently Officer Tate) arrive at the Prices' apartment complex in a blue car. The man looked briefly at the truck and then went into an apartment. Shortly after that another man made three trips from an apartment to the blue car. The first time he brought out a man whose hands were tied behind his back and had him get in the blue car. Next, he brought out another man, also tied, who was put in the car. Third, he brought out a woman, who was crying, and drove off with all three.

645 S.W.2d at 683.

Davis was not unknown to Settle at the time of the Simmons trial, August 5–19, 1981. On December 30, 1980 Settle had been appointed to represent Davis on a felony charge of theft by deception. At the time he was appointed in municipal court, Settle talked to Davis for about two minutes. (TR 86). In a second conversation, occurring between December 30, 1980 and January 8, 1981, Settle learned about Davis' record as a Vietnam veteran and that he was taking Lithium. (TR 87). He may have learned that Davis had a service-connected discharge, but he does not recall obtaining this information from him. (TR 102). On cross-examination of Davis at the Simmons trial, Settle questioned Davis about his court martial in Vietnam, but does not recall now where he obtained this information. (TR 139).

He also cross-examined Davis about a conviction in Memphis, Tennessee. Settle is "almost sure" he obtained this information through discovery. (TR. 139). He had an FBI rap sheet on Davis. (TR. 139; PX 6). This could well have also been the source of information concerning the Vietnam court martial. Settle does not recall whether he knew about Davis' treatment in the VA Hospital at Fayetteville. Although Settle does not recall talking to Davis between December 30, 1980 and January 8, 1981 (TR. 86), a memo (PX 3) which he dictated indicated that he did talk to Davis once during this period. (TR. 87).

The murders for which Simmons was charged occurred Monday, January 5, 1981. Simmons was apprehended on Tuesday, January 6, 1981 when he attempted to cash a forged check on a victim's bank account.

645 S.W.2d at 683. Settle as public defender assumed Simmons' defense on Tuesday, January 6, and represented him at a lineup on January 7. Simmons' picture appeared in the paper on either January 7 or 8 (TR 93).

On January 8, Davis came to Settle and related the story reflected in his testimony, summarized *supra.* Settle sent him to the police (PX 6; TR 298) and did considerable soul searching as to whether he could continue to represent Simmons in view of the information from his other client, Davis, about his war record and the fact that he was taking Lithium for nervousness. Settle wrote himself a memorandum about these doubts. (PX 3). While it is by no means clear, the reference to Davis' war record may have been the court martial in Vietnam although Settle doesn't specifically recall, as noted *supra.* After giving the matter thought, Settle concluded that he could continue to represent Simmons without impropriety. He justified his decision because the information obtained from Davis was discoverable and could be obtained from independent sources. (TR 99–100, 101). Mr. Settle also thought that it was his duty as public defender to handle the more serious case, if there was a possibility of conflict. (TR 108). He had extensive contacts with Simmons, involving two interviews on Tuesday, January 6, a lineup on Wednesday, January 7, and probably an interview on Thursday, January 8. (TR 109). "I was already deeply involved in the case." (TR 109). Mr. Settle testified that he did not feel that there was a conflict. "I did not as this case went to trial and I do not at this time." (TR 110). He did not feel that the information he obtained from Davis would inhibit his cross-examination of Davis: (TR 116).

> It was not a question of whether or not I could cross examine him on that material. In my view the question was whether or not we wanted to. That was the issue in this matter, not whether or not I felt constrained due to confidences or communications with Mr. Davis.

(TR 116).

The transcript of Settle's cross-examination of Davis (PX 6) discloses a vigorous, even hostile, effort to impeach Davis. Settle used distance, darkness, description and a previous statement to attack Davis' credibility. In addition Settle pushed the exploration of Davis' criminal record to the ultimate and perhaps beyond legal limits. Not only did he bring to the jury's attention Davis' military court martial and a prior criminal conviction for theft by deception in Tennessee (a misdemeanor), but he also managed to introduce evidence of the pending charge of theft by deception of which he had not been convicted.

The main criticism petitioner levels at Settle is his failure to bring out the fact that Davis was taking Lithium and that he was being treated for depression by the Veterans Administration on an outpatient basis. Lithium is a widely used drug to counter manic-depressive tendencies. It is very possible that one or more members of the jury or their families was taking Lithium or had taken it in the past. Mental illness and mental problems are common in our society and anti-depressant drugs are widely used. Petitioner seems to suggest that Lithium could have caused Davis to entertain deliriums and to hallucinate and imagine the incident about which he testified. However, with regard to the reactions or side effects of Lithium or any other drug, the final word is contained in the *Physician's Desk Reference Book* where the manufacturers of all ethical drugs are required by the Federal Drug Administration to set out all reports of adverse reactions and side effects of their products. Nowhere in the entry for Lithium is there any inclusion of hallucinations or similar neurological effects. The only neurological side effects listed are as follows: "cases of pseudotumor cerebri (increased intracranial pressure and papilledema) have been reported with Lithium use. If undetected, this condition may result in enlargement of the blind spot, constriction of vision and eventual blindness due to optic atrophy. Lithium should be discontinued, if clinically possible if this syndrome occurs." Under miscellaneous side effects

are "fatigue, lethargy, transient scotoma,[1] dehydration, weight loss, and tendency to sleep." Patients are to be cautioned "about activities requiring alertness (e.g. operating vehicles or machinery)."

Petitioner has produced a copy of Davis' hospital records at the Veterans Administration facility in Fayetteville, Arkansas for an *in camera* review. Since Davis is not available and his whereabouts are unknown, there is a question of physician/patient privilege involved in the introduction of Davis' medical records. Because this proceeding has life and death implications, the balance tips in favor of admission of these records into evidence as PX 1. However, the portions of the record after August 19, 1981 (date the trial ended) are not relevant. The earliest entry in these records is May 8, 1980 and the latest is September 28, 1988. Petitioner contends that Settle should have obtained the records and used them during the trial and that his failure to do so constituted dereliction of duty. There is no positive evidence that Settle knew of the existence of these records. (TR 141).

The petitioner contends that the information that Davis was taking Lithium should have alerted him to search for these records. This raises the question as to whether a defendant's counsel is obligated to search out the medical histories of all the state's witnesses in a criminal case. Assuming such a duty, a more serious problem exists for this petitioner with regard to these records. During the pertinent period (prior to August 1981), there is nothing to indicate any problem with perception, hallucinations, orientation or memory. In a neuropsychiatric examination of May 8, 1980, the physician (a psychiatrist) concluded as follows: "No perceptive disturbance or ideas of reference are brought out. He is not suspicious or hostile and there are no paranoid ideas. He realizes that he has difficulty controlling his emotions and generally avoids other people. He is well oriented and his memory is intact." (PX 1, p. 47 of attachment).

Although there had been a diagnosis of schizophrenia, schizo-affective type from the records, such a diagnosis was challenged and discarded in a psychiatric examination on October 28, 1980, two months before his alleged identification of Simmons. After that examination the psychiatrist wrote: "Evaluation of mental status suggests spurious Dx of Schizophrenia during period of crisis in which someone may have observed disorganization." (PX 1, p. 45 of attachment). The same physician on September 23, 1980 wrote:

"I see no signs of schizophrenia—he smiles, he has a full range of affect, he senses his behavior as sociopathic, is self reflective *no hallucinations or delusions*. He may have been given the diagnosis in a spell of temper fury sometime. The overwhelming impression is of an emotionally dyscontrolled person of dull normal IQ who avoids responsibility for his decisions and compounds his own circumstances by running or going into temper explosions. Will use Lithium and Vistaril to start."

(PX 1, p. 52 of attachment). (Emphasis added).

Between Davis' contact with the police on January 8, 1981 and the trial in August of 1981, there are two more notations in the records. Davis called his psychiatrist on January 9, 1981 "to ask some medical questions about the use of hypnosis and polygraph in his case to uncover some memories of eyewitnessed events in recent days." He was assured of "no contra-indicator to its use if he chooses to participate." (PX 1, p. 21 of attachment). This note would indicate that someone had suggested a polygraph test and hypnosis. (PX 6). His psychiatrist made the following note on March 20, 1981: "Pt in for med renewal—still in school. No excessively high mood spells on Lithium, nor unwanted side effects even at high range. Will add Inderol for emergencies." (PX 1, p. 21 of attachment). On May 20, 1981 this note appears: "Pt doing well. Stomach better. Was taken off Elavil by Dr. Walters and started on Inderol." (PX 1, p. 17 of attach-

---

**1.** The standard medical dictionaries describe "scotoma" as a blind spot in the visual field.

ment). Assuming that Davis had waived the physician/patient privilege, there is nothing in these records that would have disqualified him as a competent witness. He was a troubled Vietnam veteran, responding well to medication.

After affirmance of Simmons' conviction by the Arkansas Supreme Court and denial of certiorari, *Simmons v. Arkansas*, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983), a petition for *habeas* was filed by Mr. Ron Heller on November 8, 1983. He had been retained by the ACLU on November 4. On the same day he asked the Arkansas Supreme Court for a stay and for additional time to request post-conviction relief, but his motion was denied November 7, 1983. A history of the original *habeas corpus* petition is discussed, *infra*. That petition was denied for the reasons set forth in *Simmons v. Lockhart*, 626 F.Supp. 872 (E.D.Ark.1985). The Court of Appeals affirmed, *Simmons v. Lockhart*, 814 F.2d 504 (8th Cir.1987). The Supreme Court denied certiorari — U.S. —, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988), and the previously issued stay of execution was revoked.

Petitioner then filed a motion with the Court of Appeals to recall the mandate and grant rehearing. Judge Richard Arnold, acting as a single Circuit Judge under Fed. R.App.P. 8, stayed the execution to permit consideration of the motion by a panel of the Court of Appeals. That court granted the motion, recalled the mandate, granted the petition for rehearing and remanded the case for consideration of issues I–IV (issue V is raised for the first time):

## I

Did Simmons' lawyer, Ron Heller, in the appeal from the original *habeas* petition fail to raise the statutory overlap

issue because of alcoholism or some other reason? Was he therefore constitutionally ineffective?

## II

Was there cause for the procedural default of failing to raise the ineffective trial counsel issue in state court as well as prejudice from such failure?

## III

Why did Simmons fail to present the ineffective counsel issue in his original *habeas* petition and what was the legal import?

## IV

Whether Simmons' lawyer was faced with an actual conflict of interest that prevented him from vigorously cross-examining Davis on his military record, psychiatric problems and any deals Davis made with the prosecution.

## V

Is the petitioner's request for an expert witness to review the records and provide testimony in this cause justified?

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. FAILURE OF SIMMONS' COUNSEL TO RAISE THE OVERLAP ISSUE IN THE COURT OF APPEALS

1. Ron Heller, counsel for the petitioner did not raise the overlap issue on appeal because he believed it to be of questionable merit, having been decided adversely by the Supreme Court of Arkansas, by Judge Overton [2] and by me in the original *habeas*

---

2. Judge Overton dictated his findings from the bench in *Ruiz and Van Denton v. Lockhart*, PB–C–882–376 (1983). His findings were unreported, but they are in the case file as follows:

Taking the issues as they have been raised, and I will take first the argument that petitioners made that the capital felony murder statute and the first degree statute are overlapping and, therefore, unconstitutionally vague. Essentially this argument is that the statutes permit an arbitrary enforcement of

the death penalty under the statute, and cite Beck and Alabama as support for that proposition.

I don't think the Beck case is applicable in this situation, because in the Beck case, the Alabama jury only had the options of either an outright acquittal or a conviction with a death penalty, where the death penalty was mandatory.

In this case, the jury had a number of options under the statute. To begin with, they had

hearing in this case.[3]

The overlap issue was first considered by the Supreme Court of Arkansas in *Cromwell v. State*, 269 Ark. 104, 598 S.W.2d 733 (1980). In an opinion written by Justice George Rose Smith the court held that there was "no constitutional infirmity in the overlapping of the two sections, because there is no impermissible uncertainty in the definition of the offenses." *Id.* 598 S.W.2d at 735. The view of the Arkansas Supreme Court was reaffirmed in *Wilson v. State*, 271 Ark. 682, 611 S.W.2d 739 (1981); *Earl v. State*, 272 Ark. 5, 612 S.W.2d 98 (1981); *Warren v. State*, 272 Ark. 231, 613 S.W.2d 97, 99 (1981); *Ruiz v. State*, 273 Ark. 94, 617 S.W.2d 6, 13 (1981), *cert. denied*, 454 U.S. 1093, 102 S.Ct. 659, 70 L.Ed.2d 631 (1981); *Simpson v. State*, 274 Ark. 188, 623 S.W.2d 200 (1981); *Ford v. State*, 276 Ark. 98, 633 S.W.2d 3, 6 (1982); *Hill v. State*, 278 Ark. 194, 644 S.W.2d 282 (1983); *Owens v. State*, 283 Ark. 327, 675 S.W.2d 834, 836 (1984); *Abernathy v. State*, 278 Ark. 250, 644 S.W.2d 590, 592 (1983); *Cannon v. State*, 286 Ark. 242, 690 S.W.2d 725, 727 (1985). "The appellant next argues that the overlap between the capital murder statutes and the first degree murder statutes violated the Due Process and Equal Protection Clause of the Constitution of the United States. This argument has been made and rejected

on numerous occasions." *Zones v. State*, 287 Ark. 483, 702 S.W.2d 1, 2 (1985). *See also Coble v. State*, 274 Ark. 134, 624 S.W.2d 421, 424 (1981), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2301, 73 L.Ed.2d 1304 (1982); *Penn v. State*, 284 Ark. 234, 681 S.W.2d 307, 308 (1984); *Clines v. State*, 280 Ark. 77, 656 S.W.2d 684 (1983). In the latter case the court noted that "because the capital murder statute and the first degree murder statute overlap[,] in appropriate cases, the jury may refuse consideration of both the death penalty and life without parole, by returning a guilty verdict as to the charge of murder in the first degree." 656 S.W.2d at 686.

Citing U.S. Supreme Court authority, Justice George Rose Smith again addressed petitioner's argument in *Miller v. State*, 273 Ark. 508, 621 S.W.2d 482 (1981), a case handled by Mr. Hartenstein, one of petitioner's experts:

Essentially the same argument was rejected with respect to overlapping federal offenses in *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). There the court held that where two federal statutes authorized different ranges of punishment for the same conduct, the prosecutor's discretionary decision to proceed under the more severe statute did not involve a denial of due process or equal protection.

the option of capital felony murder, with or without the death penalty.

Furthermore, the instructions were submitted to the jury on first degree murder. And, if I recall, there was even a second degree murder instruction, which the prosecuting attorney agreed could be given. And I think they decided not to give it, simply because there was no possibility the jury would ever return that particular finding. But, nevertheless, this issue has been exhaustively reviewed the Arkansas Supreme Court, and it was reviewed in this particular case on the second appeal. And I agree with the opinion of the Arkansas Supreme Court. I don't think that the capital felony murder statute, that is Arkansas Statute, Section 41–1501 A, has any constitutional infirmity and certainly not one along the lines of the opinion in the Beck versus Alabama case.

3. Arkansas' capital murder statute, A.C.A. 1981, § 5–10–101 reads in pertinent part as follows:
(a) A person commits capital murder if:

(1) Acting alone or with one (1) or more other persons, he commits or attempts to commit rape, kidnapping, arson vehicular piracy, robbery, burglary, or escape in the first degree, and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life;

Arkansas' first degree murder statute, A.C.A. 1987, § 5–10–102 provides in pertinent part:
(a) A person commits murder in the first degree if:
(1) Acting alone or with one (1) or more other persons, he commits or attempts to commit a felony, and in the course of and in the furtherance of the felony or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life;
(2) ...

That case is controlling on the point now argued.

The Supreme Court case cited by Justice Smith involved overlapping provisions of the Omnibus Crime Control and Safe Streets Act. The language of Justice Marshall's unanimous opinion is significant:

> The provisions in issue here, however, unambiguously specify the activity proscribed and the penalties available upon conviction. See *supra,* [442 U.S.] at 119 [99 S.Ct. at 2202]. That this particular conduct may violate both Titles does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.

▮ Mr. Heller raised the overlap issue in the original *habeas* hearing before the district court. The contention was rejected in reliance on *United States v. Batchelder, supra,* in addition to several Arkansas Supreme Court cases. That opinion also cited *Gregg v. Georgia* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) in which the United States Supreme Court held that a statute is not rendered unconstitutional by the jury's option to convict a defendant of a lesser included offense. Mr. Heller testified that Judge Overton had rendered a similar decision on the overlap issue in the *habeas* hearing in *Ruiz and Van Denton v. Lockhart,* No. PB–C–82–376 (E.D.Ark. 8/25/83). Judge Overton's comments are set out, *supra,* footnote 2. (Tr. 25). An examination of Mr. Heller's brief in the appeal of this case shows that, just as in the instant case, he did not raise the overlap issue on appeal.

It was understandable that Mr. Heller would not devote brief space and argument time to an issue that had been rejected outright at least 17 times by the Supreme Court of Arkansas, and by two U.S. District Judges, and had been inferentially rejected by the Supreme Court of the United States. He testified that he "raised what I thought were a couple of the strongest issues, and that was it." (Tr. 25). The record is clear that Heller did not raise the overlap issue on the appeal to the Court of Appeals as a matter of professional judgment. "This court denied that issue. It had been denied for me once before in the Ruiz, Van Denton case at the district court level by Judge Overton. There had been a state court opinion clearly saying that it wasn't—they didn't see any merit to the issue. I did not know of any case at that time, federal court, which indicated that or that had ruled it was viable issue." (Tr. 25).

The Court of Appeals has recently commented on this strategy in *Stokes v. Armontrout,* 851 F.2d 1085, 1093 (8th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989).

> This testimony demonstrates that the attorney deliberately, in the exercise of reasonable professional judgement winnowed out the ineffective assistance of trial counsel's claim, along with thirty-six other issues, from his original motion in order to touch on the three issues he decided would be strongest on appeal. The selective process of "winnowing" and "focusing" is the "hallmark of effective appellate advocacy." See *Smith* [*v. Murray* ], 477 U.S. [527] at 536, 106 S.Ct. [2661] at 2667 [91 L.Ed.2d 434 (1986)] quoting *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3312–13, 77 L.Ed. 2d 987 (1983).

2. Mr. Heller's decision not to raise the overlap issue on appeal and to concentrate on what he regarded as the more meritorious points was a valid and defensible exercise of professional judgment in the January, 1986 appeal of the original *habeas* decision.

Attorney Ray Hartenstein, one of petitioner's experts, is highly critical of Mr. Heller's failure to raise the overlap issue on appeal. He makes the bald statement that "in my mind the issue is still an open issue before the Arkansas Supreme Court."

(TR 155). While this may be Mr. Hartenstein's opinion, an examination of the Arkansas cases, as noted, *supra,* shows that every facet of this argument has been rejected in the seventeen or more cases in which it has been raised. Mr. Hartenstein testified that, in his opinion, the Arkansas court has not passed on the arbitrary and capricious test of the overlap issue. This is simply not true. The Arkansas Supreme Court has dealt with it in several cases. *See Clines v. State, supra; Ford v. State, supra,* and *Cannon v. State, supra.* In the latter case the court specifically rejected the argument that "this overlapping of statutes permits capriciousness in charging by the prosecutor and in deciding by the jury between the offense of capital murder and the lesser included first degree murder." 690 S.W.2d at 727.

Mr. Hartenstein stated that since he handled *Wilson v. State, supra,* there are different people on the court now and that they could reconsider it in another case. (TR 155–56). There have been two changes in the Court since the *Wilson* case was decided in 1981. Chief Justice Jack Holt replaced Chief Justice Richard Adkisson, and Justice Tom Glaze replaced Justice George Rose Smith, who retired last year. In all this time not a single justice has espoused the argument advanced by Mr. Hartenstein in his testimony. (TR 154–56). The final definitive answer to this testimony of Mr. Hartenstein was delivered by Justice Newbern in *Rhodes v. State,* 290 Ark. 60, 716 S.W.2d 758 (1986): "We held in the *Wilson* case that our overlapping statutes did not run afoul of the Supreme Court decision and that our statutes do not allow the jury to sentence one convicted of homicide in an arbitrary and capricious manner." *Id.* 611 S.W.2d at 761. Since *Wilson* it has been rejected fifteen times without a dissent by the Arkansas Supreme Court.

Mr. Hartenstein testified that he considered it a viable issue at the *habeas* level. He testified, "I've raised it in every case I've had since 1980." (Tr 156). At the remand hearing the court inquired as to whether he had raised it in *Pickens v. Lockhart,* 542 F.Supp. 585 (E.D.Ark.1982),

*aff'd in part, rev'd in part,* 714 F.2d 1455 (8th Cir.1983), a *habeas* death penalty case which he had handled in this court. Mr. Hartenstein replied that he did raise this issue. (TR 183–84). An examination of this court's opinion in the case indicates that Mr. Hartenstein raised twenty issues before this court. Each of them was discussed in detail in this opinion. Mr. Hartenstein did not raise the overlap issue, which he now contends was so vital to this petitioner's case. *Pickens* was a case particularly applicable to the hypothetical advanced by Mr. Hartenstein in support of his position. (TR 155). *Pickens* involved murders in the commission of a robbery. There is no indication that the overlap issue was raised in the Court of Appeals. Indeed, not having raised it in the district court, it would have been difficult to assert it in the Court of Appeals.

Mr. Cambiano, another of petitioner's expert witnesses, questioned whether the Arkansas Supreme Court has finally decided the overlap issue. "*Cromwell* and the like kind of danced around it." (TR 47). The statement is ridiculous. If any issue has ever been put to rest by the Arkansas Supreme Court, it is the overlap issue. Mr. Hall, the third expert witness, said that he was "not completely conversant" with the overlap issue. (TR 62). He thought that the issue should have been raised since it had not been decided by the Court of Appeals or the Supreme Court. (TR 63). As noted, *supra,* Justice George Rose Smith of the Arkansas Supreme Court, one of the finest legal scholars in this country, thought that the U.S. Supreme Court had passed on this issue in *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). His views are entitled to great weight.

3. I find that Mr. Heller was not suffering from alcoholism and his faculties were not impaired when he made the decision regarding the overlap issue and filed his brief June, 1986 and argued the case in November, 1986. Mr. Heller surrendered his license to practice law in November, 1987. He filed an affidavit (PX 7) and testified that during the previous year he

had had problems with alcoholism. (TR 12). This problem would thus have arisen eleven months after he filed his appeal and five months after he filed his brief in the Court of Appeals. (TR 24). The case was argued in November of 1986. Mr. Heller testified that he never did enter a courtroom when his faculties were impaired. (TR 42). In a statement inserted into the record, this court noted that during the pertinent period there was never any indication that Mr. Heller was intoxicated (TR 41), although he frequently appeared before this court.

The record shows that during this period Mr. Heller had unusual success in death penalty cases. He secured a reversal in *Ruiz and Van Denton v. Lockhart,* 754 F.2d 254 (8th Cir.1985), a brutal and sensational multiple-murder case. He secured a second reversal in that case on November 20, 1986, having argued it on September 8, 1986. *Ruiz and Van Denton v. Lockhart,* 806 F.2d 158 (8th Cir.1986). On April 20, 1987 he tried the *habeas* case of *Richley v. Lockhart,* 707 F.Supp. 1062 (E.D.Ark.1988), which was considered with three other cases under the style of *Orndorff, et al v. Lockhart,* 707 F.Supp. 1062. *Habeas* was granted in that case, which is now on appeal. Mr. Heller gave no indication of alcoholism at the hearing on this *habeas* petition. On April 16, 1987 he filed an excellent brief and pre-trial memorandum. Significantly, he did not raise the overlap issue on behalf of Mr. Richley, even though he raised eight other issues.

 The petitioner had the burden of proving that Mr. Heller was suffering from alcoholism and this was the reason why he did not raise the overlap issue. Since his brief was filed in June, 1986, this decision was necessarily made in at least April or May, 1986. There is no proof that at this time Mr. Heller was having problems with alcoholism. At the remand hearing he testified as follows:

Q So isn't it true or couldn't it be correct that the 12 month period prior to November of '87 is just when you began to recognize the problems and that you

actually had problems sometime prior to that 12 month period?
A I can't say exactly. I don't think in November of '86, I realized I was having that much of a problem. In retrospect, in November of '87 when I surrendered my license, I certainly could see that over the last 12 months there had been a pattern, not meeting my overhead obligations and things like that, which were certainly outward objective symbols of the problems. If you're asking could it have begun before that time, the answer to that is probably yes, but I don't know if that's true. I can't say if it did or didn't, you know. (TR 11–12).

On cross-examination Mr. Heller testified as follows:

[Q] And I just want to ask you, in your own opinion, was your practice affected by the problems you were having in your practice or in your personal life in June of 1986?
A I really thought hard and long about this issue, because of my meetings with you, Mr. Gillean, and with Mr. Birch. I can't be definitive. And I'm not trying to be evasive because I know it's difficult and this is a key issue for everyone involved. I am certainly not trying to be evasive from anyone.
It's quite possible in June of 1986 when I filed the brief that I wasn't handling cases as well as I should have. However, I have no direct recollection at that time I wasn't handling them well. I just can't answer that. I would like to be able to say, "There's no way that anything affected any of my thought processes and I did everything that any other lawyer would do." But I just can't be specific and say that. (TR 31–32).

On redirect he testified:

[Q] And I think you also testified to Mr. Gillean that you can't really pinpoint the date when you actually began to experience problems that affected your performance?
A No. (TR 39–40).

This is the only significant testimony in the record concerning the effect of Mr. Heller's alcoholism on his failure to raise

the overlap issue in the Court of Appeals. It falls far short of sustaining petitioner's burden. From Mr. Heller's testimony, petitioner cannot make a case on the overlap issue. Nor is the record persuasive. Three months after he filed his brief in this case, he argued and won the second appeal in *Ruiz and Van Denton v. Lockhart, supra.* Well into the period when he admits he was having a drinking problem, in April of 1981 he tried and won a *habeas* death penalty case before this court.

## II. FAILURE OF SIMMONS' COUNSEL TO RAISE THE INEFFECTIVE COUNSEL ISSUE IN STATE COURT

■ 1. I find that Mr. Heller did not raise the ineffective counsel issue in state court because he honestly felt that Simmons' trial counsel had given him effective representation. (TR 34–35). The attorneys called by the petitioner as experts were critical of this failure. Their testimony was that this issue should be raised in every case regardless of merit. (TR 159). I do not agree with this view of the law and neither does the Court of Appeals.

> In examining the Rule 27.26 counsel's performance, "[t]he question is not whether [his] decision not to raise the [ineffective assistance of trial counsel] issue was correct or wise, but rather whether his decision was an unreasonable one which only an incompetent attorney would adopt." *Parton v. Wyrick,* 704 F.2d 415, 417 (8th Cir.1983). Stoke's Rule 27.26 counsel testified before the magistrate that he considered including in his Rule 27.26 appeal the claim that trial counsel was ineffective because he failed to raise the instructional error, but decided that it would not "justify a finding of ineffective assistance of counsel and cause the case to be reversed" by the Missouri Court of Appeals.

851 F.2d at 1092–93.

2. The only basis that has been advanced to impugn trial counsel in his performance is the conflict of interest issue. Admittedly, Mr. Heller knew nothing about this issue. (TR 17).

3. Failure to raise trial counsel's ineffective assistance in state court was a procedural default under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977). The only "cause" advanced is the ineffectiveness of Ron Heller. I find that Ron Heller was not ineffective in this respect. This finding requires a brief exploration into the background of Mr. Heller's representation. He was retained by the ACLU to represent Simmons one week before the latter's scheduled execution. (TR 15). He asked the Supreme Court of Arkansas for a stay so he could file a Rule 37 petition. (TR 16). This was denied three days later. He then filed a *habeas* petition before this court and petitioned for a stay, which was granted. (TR 17). Heller interviewed trial counsel and read the entire, lengthy transcript of the trial. Simmons' trial counsel did not volunteer information about the possible conflict. They sent him their briefs and were described as "very cooperative." Apparently Mr. Heller is charged with ineffectiveness for failing to "look through the public defender's files." (TR 18). Petitioner contends that if he had done this, he would have discovered Settle's memo on the conflict issue. It seems to me that petitioner ignores some of the time constraints under which Mr. Heller was operating. He was retained one week before the execution date. He applied for a stay to the Arkansas Supreme Court so that he could file a Rule 37 petition. This was denied. He filed a *habeas* and stay application before this court at the very last minute. The *habeas* had to be premised on an exhaustion of his state remedies. Filing of the Rule 37 petition would have led to dismissal of the *habeas* petition. The only reason he could get the stay from this court was because he had no state avenue open. With no time pressures in operation, Simmons' present counsel turned up a memo by Settle indicating a possible conflict of interest on his part. I am unwilling to find that Heller's failure to discover this document constitutes ineffectiveness on Heller's part.

4. I find also that petitioner was not prejudiced by Heller's failure to file a Rule 37 petition claiming that Simmons' trial

counsel were ineffective. As will be pointed out, *infra*, the findings will be that Simmons was not prejudiced by the alleged conflict of interests. He may well have benefitted from it. If trial counsel were not in actuality ineffective, then petitioner was not prejudiced by the procedural default in failing to raise the issue.

5. Mr. Cambiano, the first of petitioner's expert witnesses, did not deal with this issue at all. Mr. John W. Hall, the second expert, did deal with the question:

[Q] But assuming that the records in the case have established that Mr. Heller began representing Simmons approximately one week prior to the scheduled execution date and that Mr. Heller filed a petition for stay of execution and request for additional time to file a Rule 37 petition, which was denied, and assuming that Heller then obtained a stay from this Court after filing a habeas petition, what, in your opinion, would a reasonable attorney have done at that point as far as a Rule 37 proceeding?

A A Rule 37 has already been denied at that point?

Q Well, it was not denied but the stay—

A The stay was denied?

Q —pending additional time to review the records was denied.

A This Court has the power to direct parties to go back to do a Rule 37. I've had it happen in a case I've been involved in, twice, in fact. And having gotten the stay from this Court, then you have the opportunity to go back to the state court.

Assuming that this court had the power to send the parties back to file a Rule 37 petition at this stage, there is no showing that it would have done so. The only basis was ineffective assistance of trial counsel, and Mr. Heller testified that he had no reason at that point to believe that counsel were ineffective. (TR 34). Mr. Hall does not give us the style of his cases, but the circumstances may be entirely different. He may have been able to furnish the court with specific reasons for a Rule 37 petition. Mr. Heller testified that he was unable to furnish such reasons. (TR 34).

The solution offered by petitioner's last expert, Mr. Hartenstein, is simply to make the allegation of ineffective assistance of counsel. In his words, "So you make conclusory allegations to get the issue raised. Then you investigate it. You can always drop the issue later." (TR 159). In the meantime, the professional standing of an attorney has been impugned. This Court does not subscribe to such a procedure or philosophy, which is contra to Rule 11, Fed. R.Civ.P.

6. There is no proof whatsoever that Mr. Heller's alcoholism was a problem at the time he decided not to raise the ineffective assistance of counsel issue in state court. His problem with alcohol developed at a later date.

7. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) places upon the petitioner the burden to demonstrate both "professionally unreasonable conduct" by counsel and "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 691, 104 S.Ct. at 2066. I find that Heller's conduct was "professionally reasonable." I further concur in Heller's view that Simmons' trial counsel had performed reasonably and adequately in defending him. The observation of the Court of Appeals in *Stokes v. Armontrout, supra,* has particular significance:

Stokes asserts that the decision of his Rule 27.26 counsel not to advance the ineffective assistance of trial counsel claim in his post-conviction appeal to the Missouri Court of Appeals constitutes ineffective assistance of Rule 27.26 counsel, and thus cause for his procedural default. The District Court (accepting the magistrate's recommendation) rejected this allegation, holding that the Rule 27.26 counsel was not ineffective. We affirm the District Court, because we agree that Stokes has failed to show that the performance of his Rule 27.26 counsel was "professionally unreasonable" under the first prong of *Strickland.*

Heller occupied precisely the same position as the Missouri Rule 27.26 counsel in *Stokes, supra.*

In *Gilmore v. Armontrout,* 861 F.2d 1061 (8th Cir.1988) the petitioner claimed that his counsel was ineffective in failing to object to an improper argument by the prosecutor and in failing to object to testimony about the impact of the murder on the victim's family. Petitioner's attorney raised the issue of the prosecutor's remarks in his 27.26 Missouri motion but did not assert it on appeal. The district judge held that this omission was "so grossly negligent that it falls completely outside the standards of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)." 681 F.Supp. 632, 637. He granted *habeas* and the Court of Appeals reversed:

> The district court declined to undertake the cause and prejudice analysis in light of its determination that *Wainwright* was inapplicable. With due respect, we find the district court's reasoning in this regard contrary to existing Supreme Court precedent. In particular, we note that in *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986), the Court indicated that the cause and prejudice showing must be made in order to surmount a procedural default except "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent...."

*Gilmore v. Armontrout,* 861 F.2d 1061, 1066 (8th Cir.1988). As noted in 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 4266.1 (1988), no extraordinary case of such nature has been decided. I specifically find that this is not such a case.

8. Since it is clear that the petitioner must meet the test of *Wainwright v. Sykes, supra,* and since the only "cause" advanced by petitioner is the ineffective assistance of counsel, I find that petitioner has failed to carry his *Wainwright* burden. He has not established that Heller was ineffective in failing to raise alleged poor performance of trial counsel. I agree with Heller that trial counsel performed reasonably and adequately.

### III. FAILURE TO RAISE THE INEFFECTIVE COUNSEL ISSUE IN THIS HABEAS PETITION

1. Heller did not raise the ineffective counsel issue in his *habeas* petition because he believed that Simmons' trial counsel had performed adequately and reasonably.

2. There is no proof that at the time Heller made this decision he was drinking excessively or that he was an alcoholic.

■ 3. Having failed to raise this issue in his first *habeas,* petitioner's attempt to raise it now constitutes an abuse of the writ. See 28 U.S.C. § 2244(b) and Rule 9(b) of the Rule Governing § 2254 Cases in the U.S. District Courts. *See also Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Ellis v. Mabry,* 601 F.2d 363, 364 (8th Cir.1979). Petitioner deliberately withheld the ineffective assistance claim from the first *habeas* because he felt that the trial attorneys had performed in an acceptable fashion. This brings him squarely under the rule. *See Williams v. Lockhart,* 862 F.2d 155 (8th Cir.1988).

4. With reference to this issue, I reiterate the findings and legal authorities under issue II, *supra.* The same thought processes that caused Heller not to raise the ineffective issue in the state courts impelled him not to raise the issue in his *habeas* petition. I find him credible. I further agree with him that the issue was of questionable merit.

■ 5. The final answer to petitioner's contention that Heller should have raised the ineffective counsel issue in the *habeas* petition appears in *Mitchell v. Wyrick,* 727 F.2d 773 (8th Cir.1984). This was a case where the Missouri prisoner contended that the public defender appointed to represent him at trial was ineffective in failing to impeach an important state witness. He filed a Rule 27.26 motion, and another public defender from a different circuit was appointed to represent him. The latter attempted to withdraw on the basis of conflict of interest, but this request was de-

nied. Petitioner then obtained other counsel who filed a habeas petition claiming that the public defender's conflict of interest denied him effective assistance of counsel at his 27.26 hearing. In a *per curiam* opinion, the Court of Appeals wrote:

Habeas corpus is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, § 2254 gives federal courts jurisdiction to determine the constitutionality of a state criminal conviction, but does not authorize review of state postconviction relief proceedings. "Even where there may be some error in state postconviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself...." *Williams v. Missouri*, 640 F.2d 140, 144 (8th Cir.), *cert. denied*, 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981). Moreover, because state postconviction proceedings are civil in nature, the sixth amendment right to effective assistance of counsel does not attach. *Id.; Noble v. Sigler*, 351 F.2d 673, 678 (8th Cir.1965), *cert. denied*, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966). Therefore, appellant's claim that he was denied effective assistance of counsel at his Rule 27.26 hearing is not cognizable under § 2254.

727 F.2d at 774.

## IV. THE CONFLICT OF INTEREST ISSUE

■ 1. I find that petitioner's trial counsel removed the potential conflict of interest with respect to Davis and Simmons by withdrawing from the representation of Davis.

2. I find that no actual conflict of interest developed during the trial of Simmons as a result of Settle's brief representation of Davis.

3. I find that Simmons had the undivided loyalty of his counsel after Settle terminated his brief relationship with Davis. He was undoubtedly entitled to such loyalty.

*Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Williams v. Lockhart*, 849 F.2d 1134, 1138 (8th Cir.1988).

4. I find that Settle did not suffer from an actual conflict of interest that adversely affected his counsel's performance. *See Burger v. Kemp, supra; Cheek v. United States*, 858 F.2d 1330, 1337 (8th Cir.1988); *Williams v. Lockhart, supra; Hayes v. Lockhart*, 766 F.2d 1247, 1250 (8th Cir. 1985) *cert. denied*, 474 U.S. 922, 106 S.Ct. 256, 88 L.Ed.2d 263 (1985). He vigorously cross-examined Davis, as has been noted *supra*. An actual conflict of interest exists when trial counsel fails to use his best efforts to defend his client out of a sense of loyalty to a co-defendant or to otherwise benefit himself or some third party. *Glasser v. United States*, 315 U.S. 60, 72–75, 62 S.Ct. 457, 465–67, 86 L.Ed. 680 (1942); *Thomas v. Foltz*, 818 F.2d 476, 481–82 (6th Cir.1987); *Hayes v. Lockhart, supra, cert. denied*, 474 U.S. 922, 106 S.Ct. 256, 88 L.Ed.2d 263 (1985).

5. This was a case of minimal prior representation of a witness and the successor representation of the petitioner. Such a case presents a difficult problem of proving a conflict of interest. *United States v. Davis*, 766 F.2d 1452, 1457 (10th Cir.1985), *cert. denied*, 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985). Most conflict cases involve simultaneous representation of defendants and not successor representation. The petitioner carries a heavier burden in the latter situation. *See Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir.1988); *Smith v. White*, 815 F.2d 1401, 1405–06 (11th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987); *United States v. Agosto*, 675 F.2d 965, 967 n. 5 (8th Cir.1982), *cert. denied*, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982).

6. A conflict of interest may exist had petitioner's trial counsel not fully cross-examined a witness in order to avoid revealing some information that the witness had earlier disclosed to counsel while the latter was representing him. *Cheek v. United States, supra; Smith v. White, supra;*

*Porter v. Wainwright,* 805 F.2d 930, 939–40 (11th Cir.1986); *United States v. Olivares,* 786 F.2d 659, 663–64 (5th Cir.1986); *United States v. Winkle,* 722 F.2d 605, 610–11 (10th Cir.1983); *United States v. Agosto, supra.*

7. I credit Settle's testimony that he did not raise the Lithium issue as a matter of trial strategy. It was not because he felt inhibited because he had learned about it while briefly representing Davis.

8. I credit Settle's testimony that he felt no constraints whatsoever in his cross-examination of Davis. I believe that his testimony, which I find was straightforward and credible, is entitled to much respect. *See Cuyler v. Sullivan, supra; United States v. Agosto, supra.* Settle explained to my satisfaction why he did not cross-examine Davis about his taking Lithium. He testified that to pursue this matter would have made it appear that he was trying to humiliate Davis and might have alienated the jury. Drawing upon his knowledge of juries in the area, Settle thought that such an approach was dangerous. (TR 142–44).

9. I find that Settle was not obligated to search out Davis' medical records at the Veterans Administration facility at Fayetteville, Arkansas. I find that his failure to search out this information falls short of ineffective representation. Nor was it the result of his having briefly represented Davis.

10. I find that Davis' medical records, even if obtained, would not have assisted petitioner. There is nothing in these records to indicate that Davis' senses or perception was impaired or that he was suffering from delusions or hallucinations.

11. Lithium, which was prescribed for Davis' depression by psychiatrists at the VA Hospital, is an ethical drug. Hallucinations and delusions are not recognized side effects of this drug. There is no proof in the records that the drug affected his perception of the events described in his testimony. Its principal adverse side effect is scotoma or black spots in the field of vision. There is no proof that Davis suffered from this malady.

12. Assuming that Settle was prepared to use the information he had obtained from Davis to the fullest extent, and I accept his testimony in this respect, it was to Simmons' advantage for Settle to have had the information.

13. It is easy to second-guess lawyers on trial strategy. No aspect of trial practice is more controversial than the art of cross-examination. Three attorneys called by petitioner were critical of Settle's trial strategy. Others would take a different view. As one who litigated in the Arkansas courts for 30 years, I find much to commend in Settle's cross-examination and trial strategy.

14. I reject petitioner's argument that there is significance in the possibility that Settle may have violated the Code of Professional Conduct by representing Simmons after briefly representing Davis. He introduces three section of the Arkansas Code of Professional Conduct (PX 13) and claims that Settle's action were in violation of each of them. Settle, who is now a municipal judge, denies these allegations. He testified that he could have obtained all the information Davis gave him from independent sources and that he had no hesitancy in using any of it to cross-examine Davis. His only test was whether its use would further his trial strategy.

There are several problems with petitioner's argument. First, whether Settle violated the Code of Professional Conduct is a matter between Settle, Davis and the Arkansas Supreme Court Committee on Professional Conduct. I fail to see how it concerns Simmons. Second, it was advantageous to Simmons for his lawyer to have the information from Davis or his lawyer.

15. The Court of Appeals has directed this court to make findings as to whether there was a conflict of interest that prevented Settle "from vigorously cross-examining Davis on his military record." 856 F.2d at 1146. This is information that Settle may have learned from Davis while briefly representing him. Settle pulled no punches. On cross-examination he brought out that Davis was convicted of a felony by

court martial in Vietnam for "destruction of villages with civilians." Apparently, Davis had participated in a My Lai-type massacre. It is hard to conceive how more damaging testimony could have been elicited.

16. The Court of Appeals has directed this court to explore the issue of whether Settle was faced with an "actual conflict of interest that prevented him from vigorously cross-examining Davis on ... any deals with the prosecution." On this issue I find that Settle was particularly effective. By great persistence and in all probability contrary to law, Settle managed to get before the jury that the prosecutor had a pending charge of theft by deception against Davis. (PX 6, pp. 2896–2915). I find that the principal purpose of eliciting this testimony was to suggest that Davis may have made a deal with the prosecutor for his testimony in the state's behalf.

17. After thoroughly examining the cross-examination of Settle, I am convinced that it was vigorous and even hostile. It approached the outer border of fairness. I am in agreement with Settle that to have pushed this cross-examination further by going into the fact that Davis suffered from depression as a result of his service in Vietnam and was taking medication for it would have been a mistake. There is a fine line in cross-examination. When it is passed, sympathy for the witness is engendered. I find that Settle's cross-examination went to the edge. He was wise not to press it further.

## V. PETITIONER'S REQUEST FOR EXPERT WITNESS

■ The petitioner has filed a motion for an expert witness fee in the range of $1000–$1600 "to review the records and provide testimony in this cause." With regard to this request, I make the following findings:

1. This expenditure is unjustified by the record in this case.

2. Only a small part of the medical records of Davis are relevant.

3. The relevant records during the pertinent time period, consisting mainly of notations by his treating psychiatrist, are clear and unambiguous. I need no assistance in the interpretation of these records.

4. I have made Davis' medical records part of this record, in spite of the fact that they are probably privileged, so they may be scrutinized by the Court of Appeals. In my opinion, expert assistance is not necessary for an interpretation of these records.

5. These records demonstrate that Lithium was having no significant neurological effect on Davis. The authoritative source of information about this drug's actions, reactions and adverse effects is found in the Physician's Desk Reference Book.

6. These crimes occurred over eight years ago. Petitioner wants to explore interminably the mental condition of a witness as it existed at that time. The record contains the only authentic information available as to that period. This case has been before this court twice, the Court of Appeals twice, and the Supreme Court of the United States twice, as well as the Supreme Court of Arkansas. The Court of Appeals has asked this court "to proceed as quickly as practicable." 856 F.2d at 1147. In spite of this direction, I continued the case on petitioner's motion from an original trial setting of December 1, 1988 until February 13, 1989, a period of two and one half months. I find that further delays and further expenditures by the Government in this case are completely unwarranted.

7. In his motion petitioner states that Simmons was prevented from effectively cross-examining or exposing certain mental conditions of the state's key witness, James W. Davis. I have already commented on the cross-examination by Settle, which I find to be vigorous and effective. The credibility of Davis was for the jury. The jury could have disbelieved Davis entirely and still convicted Simmons. I seriously doubt whether Davis was a "key" witness. The state had other very convincing evidence besides the testimony of James Davis, as summarized in the opinion of the Supreme Court of Arkansas, *Simmons v.*

*State,* 278 Ark. 305, 645 S.W.2d 680, 682, 689:

> Holly Gentry, who was Jawana Price's employer, asked her to sell his car for him, a maroon-silver LTD. The Prices advertised the car for sale. On Saturday afternoon a witness who lived next to the Prices' apartment in Fort Smith saw a man drive up in a small yellow car. (Simmons's car was a small yellow Toyota.) The witness, who noticed the stranger looking at the LTD, told him that the Prices were away for the weekend and suggested that he come back during the week.
>
> Early Monday morning a man came by to look at the LTD, according to statements made by Jawana Price when she went to the police that afternoon to report that her husband was missing. A neighbor testified that he saw Simmons, whom he identified at a lineup and in court, looking at the LTD with Larry Price. According to Jawana's report, her husband and the visitor took a test drive together and were drinking coffee in the apartment when Jawana left for work in her own car.
>
> At some time during the morning Simmons took to his branch bank in Van Buren a $350 check drawn on a Clarksville account that had been closed by the Prices some months earlier. Simmons received $50 in cash and deposited the rest. The Price signature on the check was a forgery.
>
> ....
>
> That afternoon the witness Seaton, working at a parking lot used by Jawana, noticed a man in a yellow Toyota watching Jawana's car for more than an hour. Seaton wrote down the license number, which was shown to be Simmons's number....
>
> ....
>
> When the branch bank opened on Tuesday morning, Simmons was waiting to get in. He asked for the return of the check he had deposited the day before. The two bank employees connected the name on the check, Larry Price, with the missing-persons account that was already extensively in the news. They mentioned that fact to Simmons, but said they did not have the check at the branch. When Simmons drove away his license number was written down by one of the bank employees, whose husband was a police officer. She at once called her husband about the incident. A quick investigation traced the number to Simmons, who had given his name and address at the bank. It was also learned that Simmons was on parole from a federal prison (a fact not disclosed to the jury), that he worked at a sand and gravel company near Fort Smith, that he had not been at work on Monday, having called in to say that he had an accident in his car....
>
> ....
>
> Scientific testimony and other evidence provided much additional proof of Simmons' guilt. As to robbery, missing from the three bodies were the three men's wallets and Jawana's purse. As to rape, Jawana's body had slight bruises in the genital area, her pantyhose were on wrong side out, a belt was not through all its loops, and semen in her vagina matched Simmons's blood type but not that of Larry Price. A pistol lying under the three bodies was positively identified as the murder weapon. Its serial number had been filed down, but the number could be determined. That pistol had been bought by a neighbor of Simmons', who had lost it in the woods some two years earlier and had reported the loss to the police. From the proof the jury could have found beyond a reasonable doubt that a hair from Simmons's body was discovered in Officer Tate's shirt and another hair from Simmons's body was found in Larry Price's sock.

I do not believe, as stated by petitioner in his motion, that evidence about Davis' mental condition "could have resulted in Simmons's acquittal." There was convincing evidence of petitioner's guilt even if the testimony of Davis were completely eliminated.

## CONCLUSION

As is apparent from the findings and conclusions, I am convinced that petitioner's latest contentions are without merit. The decisions now criticized so vehemently had been made long before the period when Ron Heller, Simmons' *habeas* attorney, was allegedly suffering from alcoholism. His drinking played no part whatsoever in these decisions. Mr. Heller performed capably on behalf of Simmons just as he had performed ably and successfully on behalf of other death row inmates. The information obtained from Davis in Settle's representation of him did not inure to the detriment of Simmons. In fact, it probably helped him. Any objective appraisal of Settle's cross-examination of Davis discloses it to have been vigorous, effective and wide-ranging. There is no indication whatsoever that Settle observed any restraints.

Petitioner has not shouldered the burden placed upon him by *Wainwright v. Sykes, supra.* His present *habeas* issue constitutes an abuse of the writ.